UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
**JULIE A. SUE**, Acting Secretary of Labor, United            :
States Department of Labor,                                    :
                                                               :
                    Plaintiff,   : **MEMORANDUM DECISION AND ORDER**
                                                               :
         – against –                                  : 21-CV-57 (AMD) (RML)
                                                               :
**CE SECURITY LLC**, **CONCORD LIMOUSINE**                     :
**1 LLC**, and **ALEXANDER GAVRILOV**, as an                   :
individual,                                                    :
-------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

    Before the Court is the plaintiff's motion for summary judgment. (ECF No. 41.) For the following reasons, the motion is denied.

## BACKGROUND

**I.**    **Procedural History**

    On January 5, 2021, the plaintiff sued the defendants, claiming that they did not pay overtime to certain workers, or maintain adequate and accurate records, in violation of Sections 7(a), 11(c), 15(a)(2) and 15(a)(5) of the Fair Labor Standards Act ("FLSA"). (ECF No. 1 at 1, 12–13.) The plaintiff seeks to recover back wages and liquidated damages for the workers, and to enjoin the defendants from future violations of the FLSA. (*Id.* at 1.)

    According to the complaint, the defendants—two New York companies and the individual who effectively owns and controls both companies, (*id.* at 3–4)—collectively provide "spotholding" services for the Consolidated Edison Company of New York ("Con Ed"), (*id.* at 1). The complaint alleges that from at least January 5, 2018 through March 28, 2020, the defendants "purposely and actively attempted to misclassify their spotholder employees as

independent contractors" to avoid the FLSA and the obligation to pay required overtime premiums. (*Id.* at 2.) As a result, the defendants did not pay at least 292 current and former employees as required under the FLSA. (*Id.* at 11.)[1]

## II.   Facts[2]

Concord Limousine 1 LLC ("Concord") and CE Security LLC ("CES") are Brooklyn-based businesses that provide "black car" and "spotholding" services, respectively. (ECF No. 35-1 ¶¶ 1–6, 46.) Alexander Gavrilov is the owner and President of both entities; Atif Waheed is the Vice President, and Eric Kaviar is legal counsel. (*Id.* ¶¶ 22–23, 29, 30–31, 37–44.)

In 2013 or 2014, ConEd hired Concord to provide "spotholders" for ConEd's municipal jobs in the New York City area. (*Id.* ¶ 48.) "Spotholders" must drive to a particular ConEd worksite, place traffic cones in parking spots to prevent other drivers from taking the spots, stay until ConEd's job is finished, and then remove the traffic cones. (*Id.* ¶¶ 38, 48, 49.) The spotholders are not required to do anything else while they wait. (*Id.* ¶ 138; ECF No. 43-1, Deposition Transcript of Alexander Gavrilov ("Gavrilov Dep.") 108:22–25 ("[A]ll they have to do is sit in the car and make sure spots stay open[.]").)

### a.   *The 2016 ConEd Contract & Expansion of Spotholding Business*

At first, the spotholding business was small (Gavrilov Dep. 50:15–51:1 (Gavrilov "did not really pay big attention" to Concord's spotholding business)), and the Concord black-car drivers worked as spotholders in addition to their duties as chauffeurs. However, many of the Concord drivers were unwilling to do this work. (Gavrilov Dep. 50:17–22 (Gavrilov was "very

---

[1] The defendants filed a motion to compel arbitration on February 17, 2021 (ECF No. 11), which the Court denied on August 25, 2021 (ECF No. 15).

[2] The facts of this case are drawn from the parties' Rule 56.1 statements.

very pessimistic" about the spotholding business because his "drivers did not like it and only [a] very little percent[age]" were willing to do the work).)

The business changed rapidly in 2016, when ConEd asked the defendants to be its exclusive spotholding provider; ConEd offered the defendants a lucrative contract,[3] as well as the prospect of a long-term business relationship.[4] Gavrilov "immediately" called a meeting with Waheed and Kaviar to discuss ConEd's offer. (ECF No. 35-1 ¶ 58.)

During this meeting, Kaviar opined that the spotholders should be classified as independent contractors. The plaintiff says that Kaviar did not review any documents other than the ConEd contract, that no one "ask[ed] Kaviar" whether this was the proper classification "for purposes of the FLSA,"[5] and that "no one" "asked any follow-up questions." (ECF No. 35-1 ¶¶ 60–65.) According to the defendants, "[t]he purpose of the meeting was to discuss the classification," and "[a]fter discussing it, Kaviar formed and expressed his opinion that spotholders are independent contractors."[6] (ECF No. 35-2 ¶ 65.) Gavrilov asked whether Kaviar wanted to "learn" or "analyze" the issue further; he responded that "he [was] confident" but "will work on it a little bit deeper." (ECF No. 35-2 ¶ 64.) Kaviar also stated that "he or Gavrilov should ask an accountant." (*Id.*)

---

[3] ConEd offered $13 million for 2016 to 2018. (ECF No. 35-2 ¶ 54.)

[4] In 2015, Gravilov formed CES as a subsidiary of Concord; the businesses operate jointly, but CES now handles the spotholding business exclusively. (ECF No. 35-2 ¶¶ 10, 14; ECF 39, First Set of Joint Stipulations ¶¶ 4–9).

[5] Gavrilov testified that he did not ask about the FLSA because he "forgot." (Gavrilov Dep. 139:21.)

[6] The plaintiff asserts that Kaviar's "legal basis" for this opinion "was his experience litigating New York State unemployment and personal injury claims" for Concord's business. (ECF No. 35-1 ¶ 72.) The defendants dispute this, noting Kaviar testified that he "had done a considerable amount of work in the field of independent contractors with the Concord drivers," and "locate[d] nine cases where [he] had results on [the] issue of independent contractor[s]." (ECF No. 35-2 ¶ 72.)

3

Gavrilov called the defendants' accountant, Oleg Gorshkov, to join the meeting. (ECF No. 35-1 ¶¶ 74–75, 101.) The team asked if he agreed with Kaviar's conclusion that spotholders "be classified as 1099 contactors." (*Id.* ¶ 76.) Gorshkov agreed that spotholders were contractors in the context of tax treatment; no one asked for his opinion about the FLSA. (*Id.* ¶¶ 77–78). Gorshkov did not prepare a written analysis on the spotholders' classification under tax law or the FLSA. (*Id.* ¶ 78, 86.) At this point, the defendants agreed that the spotholders would be independent contractors; they did not have further discussions on this issue. The meeting lasted for about 45 minutes. (ECF No. 35-2 ¶ 100.)

    b.    *Hiring*

The defendants placed advertisements for spotholders in various media, and prospective workers responded—the spotholders did not advertise their services. (ECF No. 35-1 ¶¶ 133–35.) To qualify, an applicant had to "speak English, possess a driver's license, know how to drive a car, be conversant with a smart phone, and have people skills."[7] (ECF No. 42 at 12; ECF No. 35-2 ¶¶ 136–42.) The spotholders had to use their own cars, smartphones, safety cones, safety vests, safety gloves, hardhats, caution tape, measuring tape, construction boots, and flashlights. (ECF No. 35-1 ¶¶ 143–44.) The defendants leased this equipment to workers if they did not have their own.[8]

New spotholders signed a contract that outlined their duties and the defendants' expectations, as well the company's rules and policies. (*Id.* ¶¶ 148–50.) The plaintiff asserts that spotholders were "not permitted" to negotiate the terms of the new-hire contract (*id.* ¶ 154; Gavrilov Dep. 97:18–20; ECF No. 42-2, Deposition Transcript of Atif Waheed ("Waheed Dep.")

---

[7] Applicants did not need previous spotholder experience.

[8] Gavrilov was "unable to estimate" how many spotholders leased equipment from the defendants. (ECF No. 35-2 ¶ 145.)

176:4–13; ECF No. 43-6, Deposition Transcript of Eric Kaviar ("Kaviar Dep.") 51:2–4, 11–14, 52:10–23); the defendants state that they could negotiate, but "[s]o far, none of [the spotholders] has requested to change the contract." (ECF No. 35-2 ¶ 154; Gavrilov Dep. 80:21–81:4). No prospective spotholders have presented the defendants with their own contracts or agreements. (ECF No. 35-1 ¶ 155.)

   *c.* *Spotholder Duties and Expectations*

Before late 2016, new spotholders signed an "Independent Contractor Agreement" with Concord. (*Id.* ¶ 150.) The Concord agreement specified that spotholders must work at least one 12-hour shift on weekends, and once a spotholder took a job, "[that person] has to stay there for twelve hours." (*Id.* ¶¶ 161–62.) Spotholders must also be available to answer emergency jobs. (*Id.* ¶ 163.) The agreement permitted spotholders to work for other companies "if it will not interfere with the duty for [*sic*] Concord Limousine 1, LLC." (*Id.* ¶ 164.) The plaintiff asserts that "[i]nterference includes instances where spotholders reject jobs with [the defendants] because they are busy working for another company." (*Id.* ¶¶ 164–65 (citing Gavrilov Dep. 93:4–7).) The defendants say that "Gavrilov was merely stating the obvious: [t]he more time the spotholder is spotholding for another company, the less time [that person] has to spothold for the defendants;" this, the defendants assert, "illustrates the spotholder's independence." (ECF No. 35-2 ¶ 165.)

In late 2016 or early 2017, the defendants adopted a new agreement specific to CES and the spotholding business, which new spotholders signed before starting work. The CES agreement provided that spotholders must:

- call and confirm when they arrived at worksites, when they secured the worksites, and when they closed the worksites (*id.* ¶¶ 202–04);

5

- display cones on the street or on top of their vehicles within 30 minutes of arrival to the worksite (*id.* ¶ 200);

- bring six cones, a CES-provided timesheet, an orange vest, and a flashlight to each worksite (*id.* ¶ 201);

- send photos of each worksite to CES within one hour of arrival (*id.* ¶ 199);

- use a specific smartphone app, Geotag, to log in and send their locations (*id.* ¶ 181);

- complete CES-provided timesheets (*id.* ¶ 179); and

- get signoff from CES supervisors before closing a worksite and leaving (*id.* ¶¶ 183, 186).

According to the agreement, spotholders were not permitted to sleep, receive social visits, or use the bathroom while onsite without first obtaining prior permission from CES. (*Id.* ¶¶ 182, 195, 206–07.) If a spotholder needed to leave a worksite early, he had to call CES to arrange a replacement; he could not contact other spotholders directly.[9] (ECF No. 35-1 ¶¶ 196–98, 208.) According to the plaintiff, the defendants forbade spotholders from leaving a worksite at any time without prior permission except for emergencies, and did not permit workers to pay other spotholders to fill in for them.[10]

CES supervisors, or "spot checkers," verified that spotholders were at their assigned worksites and signed them out when it was time to leave. (ECF No. 35-1 ¶¶ 183–84.) The supervisors kept daily logs, and if there was an issue—for example, if the spotholder did not show up, or if "something [was] wrong on the site"—the supervisor reported the problem to CES

---

[9] Gavrilov testified that permitting spotholders to find their own replacements would lead to "total chaos." (Gavrilov Dep. 109:19 ("I'm going to go to the job, I have the job, then I call my friend, you know what, replace me. Then another guy calls another guy and ask him to replace me and then when the spotchecker, not from Concord but from the CE Security, will look and say, listen, you sent us the bill for such and such driver and such and such car but it was a different driver and a different car from that you gave.").)

[10] Waheed testified that the CES "contract was with one individual and one individual only." (Waheed Dep. 121:15–17, 122:24–25.)

6

"immediately." (*Id.* ¶ 185; ECF No. 43-20, Deposition Transcript of Zack Muradian ("Muradian Dep.") 46:6–7.)

According to the CES Spotholder Agreement, the defendants could impose "a suspension of further assignments" for thirty days upon a spotholder's first violation, and "termination from any further assignments" upon a spotholder's second violation. (ECF No. 35-1 ¶ 211.) Gavrilov testified that the defendants "[would] let [a spotholder] go" if they had continued issues with the spotholder.[11] (ECF No. 35-1 ¶ 194.)

While the defendants admit that the contracts contain these terms and conditions, they maintain that CES "did not enforce the rules." (ECF No. 46 at 9; Gavrilov Dep. 87:4–6, 110:22–111:9.) The defendants state there is no evidence that a spotholder was terminated or suspended for "playing with his cellphone or going to the bathroom," and that at least "some" spotholders "told Xiong they can basically do whatever they want." (ECF No. 46 at 9; ECF No. 45-2, Deposition of Joe Yaozu Xiong ("Xiong Dep.") 60:16–61:15; Gavrilov Dep. 87:4–6, 110:22–111:9; Waheed Dep. 165:15–18.) And while the contract required spotholders to be onsite for 12 hours, the defendants deny that spotholders work a set "shift." (ECF No. 35-2 ¶ 49.) Rather, "[t]he spotholder is there until Con Ed's work is done or until the spotholder is relieved and replaced," which "can be less than an hour, more than an hour, or however long it takes Con Ed to do Con Ed's work." (*Id.*)

The defendants point out that pursuant to the new-hire agreements, spotholders had to use their own cars, were not reimbursed for gas or mileage, and had to use their own tools or rent tools; these are some of the reasons that the defendant's accountant, Gorshkov, opined that the spotholders should be classified as independent contractors. (Gorshkov Dep. 43:11–14 ("If they

---

[11] Waheed testified that if spotholders "keep[] doing it, they won't have a job in the future." (Waheed Dep. 170:14–15.)

7

use their own tools, like a car, and are not reimbursed for gas or other expenses like meals, then they would be considered a contractor.").) They also had to use or rent their own cones, flashlights, safety vests, boots, and other equipment. (Gavrilov Dep. 61:2–11, 97:6–17; Waheed Dep. 86:21–24, 171:8–11.) Further, the defendants note that the spotholders could work for other companies or own their own businesses (ECF No. 35-2 ¶ 166), and that Xiong admitted "there were quite a few [spotholders that he] interviewed [who] did have their own independent business." (Xiong Dep. 75:3.)

        d.     *Spotholder Pay, Schedule, and Flexibility*

The parties agree that from January 5, 2018 through March 28, 2020 (the relevant time period), the defendants paid spotholders a set rate of between $13 and $14 an hour, with a maximum of 12 hours per day. (ECF No. 35-1 ¶¶ 234, 237, 242–43). The defendants did not pay spotholders bonuses or give them raises. (*Id.* ¶¶ 244–45.) The spotholders did not negotiate their own rates. (*Id.* ¶ 238.)

The plaintiff states that spotholders "routinely worked more than 40 hours per week"— "an average of 49.52 hours per week" (ECF No. 42 at 13; ECF No. 35-1 ¶¶ 241, 274), that the defendants did not pay spotholders overtime (ECF No. 35-1¶ 240), and that the workweek for spotholders started on Sunday and ended on Saturday (ECF No. 44, Declaration of Joe Yaozu Xiong ("Xiong Decl.") ¶ 10).

On the other hand, the defendants assert that "[t]he number of hours worked, or spotheld, each [week] varied widely." (ECF No. 46 at 6.) For example, Abderaman Saleh worked as a spotholder for 13 weeks with the following hours each week: 24, 12, 23.5, 20, 60, 42.75, 24,

8

7.75, 21, 25.17, 12, 36, and 19.[12] (*Id*.; Xiong Decl., Ex. B at 1.) The defendants also argue that although the average hours worked may have been 49.52, the mean is skewed because some spotholders worked double shifts every single day.[13] Further, the defendants say that "there[ is] no workweek," and that spotholders can work "anytime, any day as they wish." (ECF No. 35-2 ¶ 248; ECF No. 43-26, Deposition Transcript of Khatuna Gvidiani ("Gvidiani Dep.") 27:23–28:3.)

e. *CES's Spotholder Business Income*

Con Ed paid the defendants a set hourly rate for spotholding services, which ranged between $19.60 and $21.50 per hour, depending on the year. (ECF No. 35-1 ¶¶ 119–24.) As noted above, the defendants paid the spotholders between $13 and $14 per hour. (*Id.* ¶¶ 123, 234.)

From 2018 through 2020, the defendants invested between $151,842 and $259,076 annually in rent, repair, and maintenance to support the spotholding business. (*Id.* ¶ 232–233.) For those same years, CES paid non-spotholder employees between $280,640.02 and $302,450.75 annually. (*Id.* ¶¶ 224–26.) These employees, including the dispatch and hiring departments, accounts receivables, and payroll departments did work for both CES and Concord. (*Id.* ¶ 231.)

f. *The U.S. Wage and Hour Division's Investigation*

The U.S. Wage and Hour Division ("WHD") opened an investigation into the defendant in January 2019, conducted by Assistant District Director Joe Xiong. (*Id.* ¶¶ 257–258.) As part of WHD's investigation, Xiong interviewed spotholder employees, received written surveys

---

[12] Abdulkamal Ajelero spotheld "for a total of two weeks: 23 hours for the first week, 11.5 for the second." (*Id.*) The defendant provides other similar examples.

[13] "Anthony Ezeji worked 168 hours the week of August 18, 2018 . . . [d]id he go 168 hours without sleeping? If he slept, defendants did not discipline him for sleeping." (ECF No. 46 at 6.)

9

regarding hours, wages, and other details of the work relationship between spotholders and the defendants, and, among other things, obtained the defendants' payroll records. (*Id.* ¶¶ 259–60.)

According to the plaintiff, WHD concluded that spotholders regularly worked more than 40 hours a week, and that the defendants did not pay overtime for hours worked over 40 per week, in violation of the FLSA. (*Id.* ¶¶ 261–63.) Xiong computed back wages in the amount of $2,015,901.25 due to 292 of the defendants' spotholder employees. (*Id.* ¶¶ 263–73.)

The defendants argue that Xiong's deposition testimony conflicts with the assertions in the plaintiff's Rule 56.1 statement. Xiong testified that "some" of the spotholders told him that "they worked whenever they wanted to," "some of them" relayed that "they could reject assignments without it having any negative impact," and "some employee interview[s] indicated that" "they can basically do whatever they want, show up whenever they want, not have a fixed schedule, could be on one month, off for the next two months, and it could be completely at their own volition." (Xiong Dep. 60:1–63:13.) Xiong also concluded that that some factors in his analysis on the question of whether the spotholders were employees or independent contractors either "cut both ways" or favored independent contractor status. (*See* Xiong Dep. 62:8–19 (stating that "the amount of alleged contractors' investment in facilities and equipment" could favor "independent contractor" because "[t]he employee is required to have their own cars to perform the work.").) Xiong also testified that "spot holders had the ability and the freedom to work or other spot holding companies," and that this factor "cut[] both ways." (Xiong Dep. 67:23–68:15.)

10

       *g.*       *Defendants Reclassify Spotholders as Employees*

Gavrilov reclassified the spotholders as employees in either February or March 2021 after the start of this litigation in order to limit the defendants' liability.[14] (ECF No. 35-1 ¶ 278–84.) The defendants hired Samanta Mahon, a human resources specialist, to determine whether the spotholders should be reclassified as employees for purposes of the FLSA. (*Id.* ¶ 280.) While Mahon concluded that the spotholders should be reclassified as employees (*id.* ¶ 281), she also testified that if she knew that the spotholders could take breaks, refuse assignments, and form their own LLCs, it would have influenced her decision, (ECF No. 40-40, Deposition Transcript of Samanta Mahon ("Mahon Dep.") 64:3–67:19).

After the defendants reclassified their spotholders as employees, the job remained essentially the same, except that the spotholders now receive overtime pay and, according to the defendants, more spotholders rejected more jobs after reclassification and they worked for shorter periods of time. (ECF No. 35-1 ¶ 283.) Otherwise, the conditions of the spotholders' employment with Defendants have not changed. (*Id.* ¶ 284.)

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014). If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving

---

[14] Gavrilov, who went to school in Uzbekistan, testified: "I don't know how to translate it but there is a story which indicated that the strongest is always right. And the Government is much stronger than me. And in case there are people who are not logical and they would be able to prove that I am wrong then I don't want to be killed by penalties." (Gavrilov Dep. 149:7–12.)

11

party, there is no genuine issue for trial" and summary judgment should be granted to the moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

The movant has the burden to present evidence on each material element of its claim or defense and demonstrate that he is entitled to relief as a matter of law. *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). There is a genuine issue of material fact if a reasonable jury could decide in the non-moving party's favor. *See Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted).

To survive a summary judgment motion, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (internal quotation marks and citation omitted).

## DISCUSSION

In order "[t]o be held liable under the FLSA, a person must be an 'employer.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999). An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee," and an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(d), (e)(1). The

"determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). Courts should not focus on "isolated factors but rather upon the circumstances of the whole activity." *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

To determine whether an employee-employer relationship exists, courts in this Circuit consider the "*Brock* factors:" "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 67 (2d Cir. 2003) (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058–59 (2d Cir. 1988)). While "[t]he existence and degree of each factor is a question of fact," the "legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." *Brock*, 840 F.2d at 1059.

I. **The *Brock* Factors**

    *a.    Degree of Control*

To assess the degree of control that the defendants exercised over the spotholders' work, the Court considers whether the defendant was the ultimate decision maker on the main conditions of the spotholders' work, including schedule, worker responsibilities and compensation. *See id.* at 1061 (assessing whether the putative employer "exercises substantial control over the manner and conditions of their work"); *Franze v. Bimbo Bakeries USA, Inc.*, 826

13

F. App'x 74, 77 (2d Cir. 2020) (emphasizing that schedule flexibility "weigh[s] in favor of independent contractor status because setting one's own hours demonstrates a lack of control by the putative employer and initiative on behalf of the worker"); *Vasquez v. NS Luxury Limousine Serv., Ltd.*, No. 18-CV-10219, 2021 WL 1226567, at *5 (S.D.N.Y. Mar. 31, 2021) ("Most importantly, Defendants paid Plaintiffs.  It is a telltale sign that a worker is an employee when instead of 'selling their [services] on the market for whatever price they can command' they are 'regimented under one organization,' providing services as 'the organization desires and receiving the compensation the organization dictates.'" (citing *Goldberg*, 366 U.S. at 32)).

According to the plaintiff, the defendants "exerted immense control over every facet of their relationship with spotholders" and the work they performed.  (ECF no. 42 at 27.)  They argue that the defendants imposed "non-negotiable form contracts" containing a "litany of draconian rules," "disciplined spotholders when they turned down jobs or otherwise [broke] rules," controlled the mode, manner, and timing" of their pay, and subjected them to supervision on a "daily basis."  (ECF No. 42 at 27–28.)

The record reflects that the defendants paid the spotholders a set wage on a set schedule, which weighs in favor of finding an employer-employee relationship.  *See Vasquez*, 2021 WL 12264567, at *5.  However, there are material disputes of facts about some of the other factors.  The defendants maintain that CES "did not enforce the rules."  (ECF No. 46 at 9; Gavrilov Dep. 87:4–6, 110:22–111:9.)  They say that there is no evidence that they terminated or suspended a spotholder for, for example, "playing with his cellphone or going to the bathroom."  (ECF No. 45 at 9.)  Spotholders also do not work a set "shift."  (ECF No. 35-2 ¶ 49.)  Rather, "[t]he spotholder is there until Con Ed's work is done or until the spotholder is relieved and replaced," which "can

14

be less than an hour, more than an hour, or however long it takes Con Ed to do Con Ed's work." (*Id.*)

Moreover, "some" spotholders told Xiong—the U.S. Wage and Hour Division's investigator—that "they can basically do whatever they want."  (ECF No. 46 at 9; Xiong Dep. 60:16–61:15; Gavrilov Dep. 87:4–6, 110:22–111:9; Waheed Dep. 165:15–18.)  Xiong also testified that "there were quite a few [spotholders that he] interviewed [who] did have their own independent business."  (Xiong Dep. 75:3.)  This evidence suggests an independent contractor relationship.  *See e.g.*, *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017) ("The fact that [p]laintiffs could (and did) work for [the defendant's] business rivals and transport personal clients . . . without consequence suggests . . that [the defendant] exercised minimal control . . . [because] a company relinquishes control over its workers when it permits them to work for its competitors[, and because] when an individual is able to draw income through work for others, [that person] is less economically dependent on [their] putative employer.").

While the plaintiff cites the new-hire agreements, they do not cite any other evidence that the defendants enforced "draconian" penalties for minor infractions.  The fact that the defendants "let [a spotholder] go" if there were "issues" (ECF No. 35-1 ¶ 194), is not unusual in business relationships, and reflects only some degree of control by the defendants.

On balance, this factor weighs in favor of finding independent contractor status or, at best, is neutral.

        b.      *Opportunity for Profit or Loss*

Next, the Court considers whether spotholders had an opportunity for profit (or loss) from their work, and the degree to which they made investments in the business.

15

"The more tools that an individual provides or owns himself, the more likely he will be considered an independent contractor." *Leach v. Kaykov*, No. 07-CV-4060, 2011 WL 1240022, at *20 (E.D.N.Y. Mar. 30, 2011). The defendants required that spotholders use their own cars, smartphones, safety cones, safety vests, safety gloves, hardhats, caution tape, measuring tape, construction boots, and flashlights. (ECF No. 35-1 ¶¶ 143–44.) The spotholders could also lease equipment from the defendants. These facts weigh somewhat in favor of independent contractor status. *But see Campos v. Zopounidis*, No. 09-CV-1138, 2011 WL 2971298, at *6–7 (D. Conn. July 20, 2011) (finding on summary judgment that plaintiff-driver was an employee even though he supplied a vehicle, because plaintiff's investment was still less than defendant's).

Nevertheless, the spotholders had no real opportunity for profit or loss. They received a flat weekly payment based on the number of hours they worked, and they could not increase their profits through managerial skill or by investing capital into the business. *See e.g.*, *Gayle v. Harry Nurses Registry, Inc.*, 594 F. App'x 714, 717 (2d Cir. 2014) ("[the nurse plaintiffs] earn only an hourly wage for their labor and have no downside exposure"); *cf. Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 12 (E.D.N.Y. 2014) (independent contractor driver controlled "how much overall money he earned as a result of the number of calls he took and fares he earned"); *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 538 (S.D.N.Y. 2014) (independent contractor drivers were paid by the trip and some had "their own credit card merchant accounts to process payments from private clients")

Accordingly, this fact weighs in favor of finding that the spotholders were employees. *Jones v. Pawar Bros. Corp.*, 434 F. Supp. 3d 14, 26 (E.D.N.Y. 2020).

    c.    *Degree of Skill*

16

If workers do not need to have special skills, or if no "independent initiative" is required to perform the work, they are more likely employees. *Vasquez*, 2021 WL 12264567, at \*7. The undisputed facts in this case establish that the spotholders had to drive to a worksite, park, place traffic cones in parking spots, and wait until ConEd finished its job to remove the traffic cones. (ECF No. 35-1 ¶ 49.) They did not have to do anything else on the worksite. (ECF No. 35-1 ¶ 138; Gavrilov Dep. 108:22–25 ("[A]ll they have to do is sit in the car and make sure spots stay open.").) Thus, to be a spotholder does not require a special degree of skill. *See Saleem*, 52 F. Supp. 3d at 541; *see also Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 326 (S.D.N.Y 2001); *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 351 (E.D.N.Y. 2015) ("[D]riving is not" a "specialized skill.").

This factor weighs in favor of employee status.

   d. *Permanence or Duration of the Working Relationship*

The Court next assesses the length and nature of the relationship between the spotholders and the defendants. A worker who is "transient" and "typically works for several employers" is more likely to be an independent contractor. *Brock*, 840 F.2d at 1060; *see also Saleem*, 52 F. Supp. 3d at 543 ("Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." (quoting *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998))).

The plaintiff argues that the "spotholders signed on to work for [the defendants] for an indefinite period of time, worked full time hours, and continued to do so until they were fired or quit, similar to any other at-will employee." (ECF No. 42 at 30 (citing *Solis v. Cascom, Inc.*, No. 09-CV-257, 2011 WL 10501391, at \*6 (S.D. Ohio Sept. 21, 2011)).) The defendants dispute this

17

characterization and assert that "[t]he number of hours worked, or spotheld, each [week] varied widely," (ECF No. 46 at 6), citing examples from the plaintiff's exhibits. Moreover, "there[ was] no workweek," because the business "ebbed and flowed," and the spotholders could work "anytime, any day as they wish." (ECF No. 35-2 ¶ 248; Gvidiani Dep. 27:23–28:3.)

Given the disputes on this issue, the Court cannot find that it favors either classification. The factor is neutral.

e.  *Extent to Which Work Is Integral Park of Employer's Business*

Finally, the Court considers whether the spotholders were a critical part of the defendants' business, or whether they were less integral to the operation, which would suggest that they were independent contractors. *See Brock*, 840 F.2d at 1059 (holding that "nurses constituted the most integral part of [the defendant's] business, which is to provide health care personnel on request" and that this "weigh[s] heavily in favor" of determining that the nurses were employees). The record is undisputed that the spotholding business comprises the majority of the defendants' revenue. (ECF No. 35-1 ¶¶ 56–57.)

Accordingly, this factor favors employee status.

**II.    Genuine Issues of Material Fact Exist**

The bottom line is that there are disputes of material facts as to whether spotholders should be classified as employees under the FLSA. A reasonable jury could conclude that they worked as independent contractors—thus, a triable issue of fact exists as to the spotholders' proper classification. *See Arena v. Plandome Taxi Inc.*, No. 12-CV-1078, 2014 WL 1427907, at *7 (E.D.N.Y. Apr. 14, 2014) (denying summary judgment on the grounds that a triable issue of fact existed as to the employment status); *Jones*, 434 F. Supp. 3d at 27 (same).

Accordingly, the plaintiff's motion for summary judgment is denied.

18

## CONCLUSION

For these reasons the plaintiff's motion for summary judgment is denied. The parties are to file a joint pre-trial order that complies with the Court's Individual Rules within thirty days from the date of this Memorandum and Order.

**SO ORDERED.**

                                                                  s/Ann M. Donnelly
                                                                  ANN M. DONNELLY
                                                                  United States District Judge

Dated: Brooklyn, New York
         March 27, 2024