UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                                 :
**LORI CHAVEZ-DEREMER**, Secretary of Labor,                     :
United States Department of Labor,                               :
                                                                 :
                                   Plaintiff,                    :    **MEMORANDUM DECISION AND**
                                                                      **ORDER**
                                                                 :
                          – against –                            :    21-CV-57 (AMD) (RML)
                                                                 :
**CE SECURITY LLC**, **CONCORD LIMOUSINE**                       :
**1 LLC**, and **ALEXANDER GAVRILOV**, as an                     :
individual,                                                      :
                                                                 :
                                   Defendants.                   :
---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

On January 5, 2021, the Secretary of the United States Department of Labor[1] brought this

action against Alexander Gavrilov and his two companies, CE Security LLC ("CES") and

Concord Limousine 1, LLC, alleging that they did not pay "spotholders" overtime or maintain

adequate and accurate records, in violation of Sections 207(a), 211(c), 215(a)(2), and 215(a)(5)

of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*.  (ECF No. 1 at 1, 12–13.)

The defendants assigned the spotholders to various Con Edison worksites; the spotholders drove

to the sites, placed traffic cones in parking spots to prevent other drivers from taking the spots,

stayed until Con Edison finished the job or released them, and then removed the traffic cones.

The Secretary seeks to recover back wages and liquidated damages for the spotholders and to

enjoin the defendants from future violations of the FLSA.  (*Id.* at 1.)  After carefully considering

---

[1] Under Federal Rule of Civil Procedure 25(d), the successor of a party who is a public official is
 automatically substituted as the party to the suit.

the trial evidence, the arguments of counsel, and the controlling law, the Court finds that the spotholders are employees under the FLSA, awards back wages and liquidated damages in the amounts described in Section VI of this opinion, and grants injunctive relief as described in Section VII of this opinion.

## PROCEDURAL HISTORY

The Secretary brought this action on January 5, 2021.  (ECF No. 1.)  The Court denied the Secretary's motion for summary judgment on March 27, 2024 (ECF No. 41), because there were genuine disputes of material facts about whether the spotholders should be classified as the defendants' employees under the FLSA, or as independent contractors.  (ECF No. 51 at 18.)  The Court found that some factors, including the spotholders' lack of opportunity for profit or loss, lack of specialized skills, and the importance of the spotholding work to the defendants' business, favored finding that the spotholders were employees, but there were factual disputes about the degree of control the defendants exerted over the spotholders, whether and how the defendants enforced rules and determined disciplinary measures for violating the rules, and whether the spotholders worked regular shifts or had other jobs.  (*Id.* at 13–18.)

## LEGAL STANDARD

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  "The findings and conclusions . . . may appear in an opinion or a memorandum of decision filed by the court."  *Id.*

**FINDINGS OF FACT**[2, 3]

The Court held a four-day bench trial, beginning on June 17, 2025, at which fifteen witnesses testified.  (*ECF Minute Entries dated June 17–18, 20, 23, 2025.*)

**I.    The Defendants' Spotholding Business**

**a.    The Defendants**

From January 5, 2018 through March 1, 2023, the defendants CES and Concord engaged in the business of providing spotholding services to a single client, Con Edison.  (ECF No. 64, Joint Stipulations ("Joint Stips.") ¶¶ 26, 66.)[4]  Spotholders, as explained in more detail below, secure parking spaces for Con Edison in New York City, so that Con Edison can do its work. The defendants shared interrelated operations, centralized control of labor relations, common management, common owners, and financial control, and operated as a single, integrated enterprise.  (*Id.*, Joint Stips. ¶¶ 1–5.)  Alexander Gavrilov is the sole owner and President of CES and the sole member and owner of Concord.  (*Id.*, Joint Stips. ¶¶ 10–25, 36.)  Atif Waheed is the Vice President and general manager of Concord, and Eric Kaviar is Vice President and legal

---

[2] After the parties submitted initial post-trial briefing, the Secretary moved to strike two portions of the defendants' post-trial brief (ECF No. 82): (1) a visual aid illustrating certain of the spotholders' hours at issue in this case, attached as Exhibit A (ECF No. 82-1), and (2) the citations to Rule 56.1 statements and underlying deposition transcripts.  (ECF No. 83.)  The defendants opposed.  (ECF No. 84.)  The Court denies the motion and admits the evidence into the trial record.  The Court addresses the defendants' evidence in the Findings of Fact.

[3] The findings of fact are based on the trial testimony, exhibits, deposition transcripts, and the Court's evaluation of the witnesses' credibility.  Citations to "Tr." are to the trial transcript, citations to "Sec. Ex." are to the Secretary's exhibits, and citations to "[Name] Dep." are to the deposition transcripts. The Court incorporates into the trial record the designated portions of the depositions to which the defendants did not object.  (*See* ECF No. 64 at 23–27.)  *See also* Fed. R. Civ. P. 32(a).  The Court has also considered the parties' proposed findings of fact, and the facts to which the parties stipulated in the joint pretrial order.  (ECF No. 64 at 4–14; ECF Nos. 81, 82.)  As explained in n.2 above, the Court considers the exhibits and deposition testimony that the defendants cite, even if that evidence was not designated in the joint pretrial order.

[4] In their Joint Pretrial Order, the parties stipulated to certain facts.  (*See* ECF No. 64 at 4–14.)  The joint stipulations were in evidence and binding on the parties.  (Tr. 5:2-8.)

counsel of Concord.  (*Id.*, Joint Stips. ¶ 36.)  Concord began providing spotholding work for Con Edison in 2013 or 2014.  (*Id.*, Joint Stips. ¶¶ 53–54.)  Gavrilov formed CES as a subsidiary of Concord in 2016 to handle accounting and payroll for the spotholders.  (*Id.*, Joint Stips. ¶¶ 30–32; Sec. Ex. 19.)  The defendants are organized under New York law and have their principal offices at the same building in Brooklyn.  (ECF No. 64, Joint Stips. ¶ 9.)

### b.      The 2016 Con Edison Contract and Expansion of Spotholding Business

When Concord started in the spotholding business, drivers from its limousine business did the spotholding work.  (ECF No. 64, Joint Stips. ¶¶ 50–51, 54.)  In 2016, the defendants entered into a larger, $13 million contract with Con Edison, and agreed to provide spotholding services from May 20, 2016 through June 30, 2018.  (ECF No. 64, Joint Stips. ¶ 55; Sec. Ex. 10.)  Concord expanded its arrangement with Con Edison again, entering into a $67.64 million contract for July 1, 2018 through December 15, 2021.  (ECF No. 64, Joint Stips. ¶ 65; Sec. Ex. 11 at 1.)  These contracts required Concord to comply with the Fair Labor Standards Act.  (ECF No. 64, Joint Stips. ¶ 67; Sec. Ex. 10 at 20; Sec. Ex. 11 at 21.)  From 2018 onward, about 60 to 80% of Concord's annual income came from the spotholding business, and CES derived all of its revenue from spotholding.  (Tr. 168:19–169:20; Gavrilov Dep. 47:9-11.)  Without the spotholders, CES and Concord could not have fulfilled their contractual obligations to Con Edison.  (ECF No. 64, Joint Stips. ¶¶ 103–04.)

### c.      The Defendants' Classification of Spotholders as Contractors

In 2016, shortly after Con Edison offered Concord the $13 million contract, Gavrilov met with Waheed and in-house counsel Eric Kaviar to discuss the contract; Oleg Gorshkov, the defendants' outside accountant, joined the meeting later.  (ECF No. 64, Joint Stips. ¶¶ 55–56;

4

Tr. 170:7-22.)  The meeting was "very short."  (Tr. 173:6-13; Gavrilov Dep. 145:1-9.)[5]  Kaviar recommended, without any explanation or legal analysis, that the defendants classify the spotholders as independent contractors.  (ECF No. 64, Joint Stips. ¶¶ 59–60; Tr. 172:2-4, 195:6-10, 348:8-10, 348:19–349:4, 395:9-15, 398:22-25; Kaviar Dep. 110:9-17.)  In making his decision, Kaviar reviewed only the Con Edison contract, which required Concord to comply with the FLSA.  (ECF No. 64, Joint Stips. ¶ 58; Tr. 194:19–195:10, 347:25–348:7, 396:10–398:25.)  Nevertheless, despite the contract language, nobody asked Kaviar any follow-up questions, nor did they discuss the FLSA or whether the spotholders were properly classified as independent contractors under the FLSA.  (Tr. 173:21–174:2, 348:14-18, 395:20–396:9; Gavrilov Dep. 139:16-23, 141:6-19; Waheed Dep. 80:13-15, 98:12-14.)[6]

At Kaviar's suggestion, Gorshkov also joined the meeting to discuss the contract.  (Tr. 170:13-22, 174:3-5, 196:6-14.)  Gorshkov agreed that the spotholders should be classified as independent contractors, a conclusion based on his accounting expertise and knowledge of the IRS code.  (Tr. 174:6-9, 196:6-18, 376:12–377:12, 379:11-13.)  Gorshkov had no experience with the FLSA, and no one at the meeting asked him to analyze the issue under the FLSA.  (Tr. 376:25–377:12.)  Based on this meeting, the defendants classified the spotholders as independent

---

[5] Gavrilov testified on direct examination that the meeting lasted "at least two hours."  (Tr. 172:14-18.)  At his deposition, however, he estimated that the meeting was "about forty five minutes," and that Gorshkov was there for fifteen to twenty minutes, which is consistent with Gorshkov's testimony.  (Gavrilov Dep. 145:1-9; Tr. 375:17-25.)  None of the participants in the meeting disputed the substance of the discussion.

[6] In their post-trial brief, the defendants cite the parties' Rule 56.1 statements, which describe, among other things, that "Gavrilov asked whether further research or legal analysis was necessary, and Kaviar responded that he was confident in his conclusion but would 'work on it a little bit deeper.'"  (ECF No. 82 at 30 (citing ECF Nos. 35-1 ¶ 77, 35-2 ¶ 64).)  But this is irrelevant, because the defendants concede that they never discussed the FLSA.

contractors and did not pay them overtime premium from 2016 through at least early 2021. (ECF No. 64, Joint Stips. ¶¶ 63, 117–18.)

This was the only discussion the defendants had about the proper classification of spotholders, until the Department of Labor commenced the FLSA investigation that later gave rise to this litigation.  (*Id.*, Joint Stips. ¶ 63.)

## II.    The Spotholders

Nine spotholders testified about their experiences working for the defendants: Dennis Danville, Catrice Brown, Gerald Celestine, Kamal Olalekan, Folusho Babatunde, Ansel Campbell, Christopher Guevara, Anthony Smith, and Olubukola Ogunsemowo.[7]  The Court credits their testimony, which was consistent, credible, and supported by the documentary evidence, in its entirety.  In broad terms, their testimony established the following:

- Most of the spotholders got their positions by answering the defendants' advertisements.  The job required no experience or special qualifications, and once they took the job there was little training.  Before they started, the spotholders had to sign a form contract — which the defendants prepared — for an indefinite duration.  The contract set forth the terms of the relationship between the defendants and spotholders, the rules the spotholders had to follow, and the consequences violating them (*see* Section II.b–c);

- The defendants paid the spotholders hourly wages, which the defendants set and changed unilaterally (*see* Section II.d);

---

[7] 329 spotholders are the subjects of this action.  (ECF No. 64 at 3–4, 33–43.)  The parties stipulated that the "[d]efendants agree not to argue that this number of spotholders is insufficient to establish the representativeness of the spotholders on whose behalf the Secretary seeks back wages and liquidated damages, and further agree that additional spotholder testimony would be cumulative."  (ECF No. 77 at 1.)  Accordingly, the Court treats the nine spotholders' testimony as representative of the spotholders who worked overtime hours for the relevant time period of January 5, 2018 through March 28, 2020.

- The defendants' dispatch office contacted spotholders, often on short notice, with the start date, time, and location of a particular job (*see* Section II.e.i);

- The standard shift length for most of the relevant time period was twelve hours, although it could be shorter under some circumstances.  A shift could also be longer by hours or even days (*see* Section II.f);

- The defendants required the spotholders to contact the dispatch office when they arrived at a jobsite, when they set up their cones, and before leaving a jobsite, and both the dispatch office and supervisors in the field, or "spot checkers," regularly checked on them during shifts (*see* Section II.e.ii);

- The defendants, through the dispatch office and spot checkers, regularly disciplined spotholders for violating the rules.  Discipline included withholding job assignments and threatening termination (*see* Section II.e.iii).

### a.     Spotholding Generally

Spotholders save parking spaces for Con Edison workers.  The spotholder drives to a jobsite, parks, and places traffic cones, as instructed by the defendants, to keep people from parking their cars around the Con Edison structure that needs work.  (Tr. 8:15-19, 124:19-22, 213:14-20, 282:8–283:2, 310:25–311:8, 343:5-9, 412:16-21, 444:14-16, 477:23–478:8; Gavrilov Dep. 69:14–70:6.)  If cars are parked at a jobsite, the spotholder monitors the area and puts cones in the space when the car leaves, a process that continues until enough spots are secured. (Tr. 13:19-25, 20:8–21:2, 97:22-25, 282:15-25, 415:5-17, 449:9-13.)

In this case, the defendants required the spotholders to stay in or near their cars until the defendants let them go; that could happen in one of several ways: (1) the defendants sent a spotholder to take the next shift (Tr. 22:2-9, 70:8-22, 285:25–286:6, 317:6-14, 421:14-19, 451:4–

452:4, 479:17-20); (2) the defendants' supervisors notified the spotholder that the job was closed and they were no longer needed at that jobsite (Tr. 22:10-17, 123:21–124:11, 317:6-11); or (3) Con Edison notified the spotholder that Con Edison no longer needed him or her (Tr. 239:21–240:19, 421:14-19, 451:4-15).

### b.      Hiring

The defendants advertised for spotholders on Craigslist, in newspapers, on the radio, and on a television billboard on the defendants' building in Brooklyn.  (ECF No. 64, Joint Stips. ¶ 68.)  The defendants did not look for or hire spotholders who placed their own advertisements (*id.*, Joint Stips. ¶ 69), and nothing in the record suggests that the spotholders advertised their services.  The spotholders learned about the job from the defendants' advertisements or by word of mouth and then applied for the job.  (Tr. 8:20–9:2, 74:19-21, 75:2-5, 118:24–119:15, 246:15–247:3, 276:18-22, 305:5-17, 412:25–413:13, 444:20–445:13, 470:3-11.)[8]

Applicants came to the defendants' Brooklyn location.  They gave their contact information and showed proof that they had a driver's license, a car, and car insurance.  (ECF No. 64, Joint Stips. ¶¶ 70–74; Tr. 9:3-11, 75:2-11, 119:2–120:2, 246:17–247:7, 305:11–306:4, 413:5-18, 445:8-13, 470:5-11.)  The qualifications were minimal.  They did not need have a particular kind of car; a spotholder could use "[w]hatever car you have."  (Tr. 480:8-9.)  Nor did spotholders need to have formal education or degrees, specialized skills, or previous spotholder experience.  (ECF No. 64, Joint Stips. ¶¶ 70–71; Tr. 75:6-11, 119:25–120:6, 156:4-14, 247:1-7, 341:8-10, 413:16-18, 471:3-8.)  Generally, aside from confirming that the applicant had a

---

[8] Folusho Babatunde and Ansel Campbell worked for a different spotholding company that was going out of business; the defendants offered jobs to that company's spotholders.  (Tr. 276:18–277:19; 305:5–17.)

driver's license and car insurance, the "only question" asked during the interview was whether the applicant "[had] done this work before."  (Tr. 247:1-7.)

The defendants had the applicants sign a form contract, which Kaviar drafted.  (ECF No. 64, Joint Stips. ¶¶ 77–80.)  The spotholders could not negotiate the terms of the contract. (*Id.*, Joint Stips. ¶ 79; Tr. 10:19–11:1, 161:23–162:12 (discussing Sec. Exs. 24, 25), 163:11-23, 321:7-15, 342:24–343:4, 400:7-15; Gavrilov Dep. 97:18-20; Waheed Dep. 176:4-13; Kaviar Dep. 51:11-14.)  The two versions of the contract that the defendants used during the relevant time period included the following provisions:

| Concord Contract (Sec. Ex. 24) | CES Contract (Sec. Ex. 25) |
|---|---|
| • "[Spotholder] must have a safe and functional car which must be insured." ¶ 1. | • "For my vehicle used in this business I will have valid registration and insurance at all times." ¶ 1. |
| • "[Spotholder] can reject offered job, all accepted jobs must be completed." ¶ 3. | • "[Spotholder] may accept or reject assignments and take vacations as he/she deems desirable." ¶ 14. |
| • "[Spotholder] must contact Concord . . . when arriving/leaving the work site location, in addition to Con Edison closing the work site and releasing you from work site." ¶ 11. | • "[Spotholder] must call [CES] when he/she arrives at the site and advise of arrival.  Also, the [spotholder] must again call once the site has been secured.  The [spotholder] must call the base when the site closes for his/her shift." ¶ 9. |
| • "[Spotholder] must remain on site at all times and be prepared to stay until work is finished as determined by Con Edison." ¶ 15. | • "[Spotholder] cannot leave the site at any time during his/her shift except for emergencies . . . [s]hould the [spotholder] need to leave the location for any emergency such as bathroom break, the [spotholder] must first call the base and obtain prior permission confirmed by text or e-mail." ¶ 3. |
| • Spotholder "will not smoke" and "will not sleep while on location." ¶¶ 7–8. | • "There will be no sleeping on job by the [spotholder] and no social visits." ¶ 11. |

| | |
|---|---|
| • "[Spotholder] will be responsible for items distributed to them . . . orange hardhat, pair of safety gloves, safety vest, flash light, 10 safety cones." Ex. 24 at 2. | • "[Spotholder] must bring to the site six cones, the [CES] provided timesheet, an orange vest and a flashlight." ¶ 8. |

The defendants used the contracts to tell spotholders how to do the job, what the rules were, and what the consequences were for violating them.  (ECF No. 64, Joint Stips. ¶ 82; Tr. 162:17-19, 342:7–343:4; Waheed Dep. 181:9-17.)  As discussed further below, the spotholders consistently testified that they understood that these and other rules applied to them and that they expected the defendants to enforce them.  (*See, e.g.*, Tr. 17:21–18:3 ("You understood that [sleeping] was prohibited because at some point you were told and at some point the supervisor would come and check to see that you were not sleeping"), 18:23–19:1, 82:24–83:4, 128:4-10, 221:15-21, 248:10-16, 252:15–253:1, 278:22–279:12, 279:20-25, 307:8-23, 414:17–415:17, 446:13–447:5, 472:7-17.)  The contracts were open-ended; there were no end dates or timeframes for completion.  (ECF No. 64, Joint Stips. ¶ 81; Sec. Exs. 10–11.)  The defendants did not tell the spotholders that the job was temporary, and the spotholders "had the understanding that it would be an open-ended job."  (Tr. 10:3-18; *see also* Tr. 75:12-16, 120:7-13, 277:24–278:1, 306:10-12, 413:24–414:1, 445:21-23, 471:13-20.)

c.      **Orientation**

According to the witnesses, the orientation or training was minimal or nonexistent.  Some spotholders described an "orientation" that "covered what you need and how to work on the job."  (Tr. 11:5–12:6; *see also* Tr. 247:15–248:3, 342:11-17, 414:2-11, 440:12–441:8, 445:24–446:5, 471:21–472:6, 489:5-17.)  Another spotholder said that he learned on the job "as [he] went along" and a supervisor, or "spot checker," told him what to do.  (Tr. 121:10-22, 146:10-17.)  For new hires, the training generally covered the proper use of hard hats; how to identify

10

manhole covers, services boxes, transformer manholes, and metal sidewalk vaults; safety protocols; and how to measure parking spots.  (ECF No. 64, Joint Stips. ¶ 76; Tr. 247:15–248:3, 414:4-11, 489:8-17.)  Three spotholders testified that the defendants hired them from another spotholding company and did not train them.  (Tr. 276:3-10, 278:9-13, 294:6-16, 304:15-19, 306:13-23; 445:24–446:5.)  At least three of the four spotholders with no prior experience got their first assignment the same week that they were hired.  (Tr. 120:3-6, 120:22-23, 247:2-7, 247:12-14, 471:3-8; 472:21-25.)

As explained above, the defendants required spotholders to use specific equipment — including hard hats, safety gloves, safety vests, flashlights, and safety cones — some of which the spotholders leased or purchased from the defendants.  (ECF No. 64, Joint Stips. ¶ 74; Tr. 11:9-23; Sec. Ex. 24 at 2; Sec. Ex. 25 ¶ 8.)  One spotholder, Olubukola Ogunsemowo, testified that she had to purchase ten cones from Concord for $100.  (Tr. 470:17–471:2, 492:9-17.)  As noted above, the defendants required the spotholders to use their own cars; they did not have supplemental business insurance and did not change their car insurance to account for the spotholding work after becoming spotholders.  (ECF No. 64, Joint Stips. ¶ 73; Tr. 25:15–26:3, 75:6-11, 87:1-6, 130:23–131:8, 253:24–254:12, 286:9-20, 318:3-17, 413:16-18, 422:11-15, 452:9-15, 480:4-15; Sec. Ex. 24 ¶ 1; Sec. Ex. 25 ¶¶ 1, 14.)

**d.    Pay**

The defendants paid the spotholders a flat hourly rate for each hour they worked.  (ECF No. 64, Joint Stips. ¶ 113.)  Gavrilov set their hourly pay rate based on the rate that Con Edison paid the defendants, and the spotholders had no opportunity to negotiate the rate, even when the

11

defendants lowered it.[9]  (ECF No. 64, Joint Stips. ¶¶ 114–15; *see* Tr. 202:22–204:4; *see also* Tr. 9:24-25, 36:13-25, 120:14-19, 134:4-12 (Q: "Did you ever try to negotiate your pay when you worked at Concord?"  A: "I asked.  I didn't get no kind of feedback or anything.  I got demoted, though.  They took my pay from 14 down to 13.50."), 247:8-9, 290:6-20 (Q: "Could you negotiate your hourly rate with Concord?"  A: "There's no room for that."  Q: "Did anyone explain to you why your hourly rate changed so much?"  A: "Like I said, again, there's no room for that. . . .  They were the owners.  You can't really ask questions."), 320:22-24, 425:13-18, 453:15–454:8, 486:5-9.)  One spotholder, Anthony Smith, testified that the defendants "never explained" why they lowered spotholders' hourly pay rates; "if you complained too much you might not get a [spotholding] job."  (Tr. 453:15–454:8.)

The defendants paid the spotholders based on the hours that the spotholders recorded on their timesheets.  (ECF No. 64, Joint Stips. ¶¶ 121–25; Tr. 287:16-19, 422:19–423:5, 452:25–453:14, 482:20–483:1.)  After the spotholders set up the cones, they used a smartphone app called Geotag to send a photograph of the worksite to the dispatch office.  (ECF No. 64, Joint Stips. ¶ 90; Tr. 14:9-23.)  Geotag logged the time and address where the spotholder took the picture; the dispatchers told the spotholders to use the timestamp on the photograph as the starting time for their shifts on their timesheets.  (Tr. 14:9-23.)  The defendants did not pay the spotholders for the time they worked before they took the photograph driving to the worksite, parking, and setting up the cones.  (Tr. 14:24–15:11.)  Nor did the defendants pay overtime premiums for the hours the spotholders worked in excess of 40 hours per workweek, until at least

---

[9] The defendants lowered spotholders' hourly rate from $15 to about $13.50 when Con Edison reduced the rate paid to the company.  (Tr. 202:22–204:4; *see* Sec. Ex. 27.)

February or March 2021.  (ECF No. 64, Joint Stips. ¶¶ 117–18.)  The defendants never rewarded the spotholders with raises or bonuses for good work.  (*Id.*, Joint Stips. ¶¶ 119–20.)

The spotholders had no opportunity to make money, apart from their hourly wages for the time that they spent spotholding.  Nor could they find their own replacements.  The form contract provided that the spotholder could not "make arrangements to be replaced without prior written approval by a Supervisor of [CES].  Should the [spotholder] fail to obtain prior written [CES] approval from his Supervisor for the replacement, then all remuneration for that non-approved replacement will be forfeited."  (Sec. Ex. 25 ¶ 11; *see also* Tr. 166:17-19, 345:1-13.)  According to the spotholders, they also could not subcontract their assignments to someone else.  (Tr. 32:6-13, 78:24–79:4, 124:12-14, 255:12-22, 281:24–282:3, 310:2-14, 418:10-13, 448:19-22, 477:19-22.)

The defendants never offered the spotholders the opportunity to invest in the company or to enter into any kind of business arrangements with the defendants.  (Tr. 88:10-25 (Q: "Was there any opportunity for to you invest in Concord's business in any way?"  A: "I don't understand what you mean by that."), 111:14-18, 118:18-23, 260:9–261:2 (Q: "[A]re you aware that spotholders at CE Security were permitted to form their own entities and hire other spotholders to work for them?  Were you aware of that?"  A: "I don't understand your question.  Can you repeat that."), 297:3-11 (Q: "Were you ever made aware that as a spotholder you were permitted to form your own business and hire other spotholders to work for you?"  A: "That never happens."), 334:4–335:5 (Q: "Are you aware . . . that there were many spot holders . . . [who] formed a company, let's say ABC, Inc., and that company then did spotholding for

13

those spot holders?"  A: "I didn't know that. . . . I didn't know all that you are talking about."), 434:7-10, 463:6-10, 499:4-6.)[10]

### e.  Assignments and Supervision

#### i.  *Concord Dispatch Office Assignments*

The dispatch office monitored emails for spotholder requests from Con Edison.  When a dispatcher received a request, he or she called or texted spotholders, often on short notice.  (ECF No. 64, Joint Stips. ¶ 101; Tr. 30:9-17, 76:19–77:8 (the dispatcher would say, "oh, we have this available . . . how soon could you get there . . . could you be there as soon as possible.  It was a 24-hour business, so it could be any time."), 122:10-17 ("Sometimes they would send a job right then and there and tell us to be there ASAP."), 146:18-23 ("Sometimes they would call me an hour before the job telling me, this is an ASAP.  That means get there as soon as you can."), 211:16-23, 473:13-24 ("At times it has to be ASAP . . . [i]t might be 30 minutes before the assignment or one hour before the assignment."); Sec. Ex. 30 at 113 (DEF0007491) ("urgent request" from Con Edison to dispatch a spotter "en route ASAP to 300 E 77 Street"), 115–16 (DEF0007596, 7598) (Con Edison requesting an "ASAP dispatch" at 11:46 a.m., and the spotholder arrived at 12:15 p.m.), 129 (DEF0009703) (Con Edison requesting a spotholder at 2:12 p.m. for 3:00 p.m. the same day), 346–47 (DEF0042592–93) (Concord dispatching eight spotholders at once on short notice).)

Some spotholders testified that the dispatch office took into account their preferences, for example, shift times or areas of the city.  (*See, e.g.*, Tr. 11:24–12:17 (spotholder testifying that he

---

[10] The defendants' records show that they paid some corporate entities for spotholding services.  (Tr. 562:4-13.)  This case pertains only to individual spotholders, and as discussed in Section III.a, the Secretary excluded the corporate entities from the damages computations.  (Tr. 562:4-24; Sec. Exs. 27–28.)

14

"preferred to work [the] afternoon shift, to midnight" and "[s]ometimes the overnight shift, Monday to Thursday"), 307:4-7; *but see, e.g.*, Tr. 228:19–229:12 (former dispatcher describing consequences for spotholders who did not accept jobs due to the location).) The dispatch office gave the assigned spotholder the start date, start time, and location for a job. (ECF No. 64, Joint Stips. ¶¶ 100–01; Tr. 31:4-13, 211:24–212:6, 281:5-9, 287:10-12, 308:12-18, 416:6–417:1, 473:25–474:12.)

### ii.    Concord's Supervision of Spotholders

In addition to sending time-stamped photographs of the jobsite to the dispatch office, the defendants required spotholders to contact the dispatch office when they got to the assigned location and when they set up their cones. (ECF No. 64, Joint Stips. ¶ 90; Tr. 13:5-16, 14:9-23, 124:15-22, 211:6-15, 213:14-23, 216:1-17, 282:8-14, 312:20–313:14, 343:10-13, 449:4-8, 478:18–479:2; *see, e.g.*, Sec. Ex. 30 at 38 (DEF004419).) They also required spotholders to contact them before leaving a jobsite. (Sec. Ex. 24 ¶ 11; Sec. Ex. 25 ¶ 9.) A Con Edison foreperson had to sign off on the spotholders' timesheets. (Sec. Ex. 24 ¶¶ 11–12; Tr. 239:21–240:19, 421:14-19, 451:4-15.)

The defendants' dispatch office regularly checked in with the spotholders during their shifts to ensure compliance with the rules and to get progress updates. (Tr. 16:4-10, 81:3-23, 124:23–125:2, 214:4–216:21, 283:25–285:6, 449:14-24, 479:3-10.) The dispatch office also checked in with spotholders when preparing their regular reports to Con Edison at noon and midnight. (Tr. 214:4-17.) The dispatchers called spotholders for other reasons, for example, to find out if cars were blocking access to a Con Edison site. (Tr. 214:23–215:16.) According to former dispatch office employee Takeia Galloway, the dispatchers made these calls to spotholders "[e]very day" they were on the job. (Tr. 217:7-15.) The dispatchers sometimes

required spotholders to call them every two hours.  (Tr. 314:9-14.)  The defendants also expected the spotholders to report any issues at a jobsite.  (Tr. 84:14-25, 220:22–221:14 ("sometimes . . . the police[] come by and give [the spotholders] problems" and "[the Department of] [S]anitation used to come by and harass them as well" about the spots they were holding); *see* Sec. Ex. 30 at 76–78 (DEF0005275, DEF0005317, DEF0005337), 141 (DEF0011398), 300–01 (DEF0035724– 25) (June 1, 2020 email from Concord dispatcher to Con Edison describing that the "spotter was approached by police to move from location for safety reasons but spotter told police that we are working and police said okay stay at your own risk .. now the officer has instructed our spotter to move from this area due to them closing the street.  As of now, the spotter will relocate to the safest nearby area until he is able to return.").)

The defendants employed spot checkers to monitor the spotholders, and ensure that they followed the rules.  (ECF No. 64, Joint Stips. ¶¶ 91–96; Tr. 16:11-18 (spotholder Dennis Danville testified that spot checkers came by "[a]t least once per shift"), 81:24–82:11 (spotholder Catrice Brown testified that "by the end of my employment there, [spot checkers] came every shift"), 125:3-17 (spotholder Gerald Celestine testified that "[s]ometimes, the first day [at a jobsite] you might have a spot checker come"), 220:17-20, 248:18–249:1 (spotholder Kamal Olalekan testified that "the supervisor" came to the jobsite "[e]very day"), 314:15-24 (spotholder Ansel Campbell testified that the "supervisor will pass through . . . [o]nce a day"), 343:15–344:4, 449:25–450:6 (spotholder Anthony Smith testified that "the supervisor who did the regular routine check" would come to the jobsite), 478:6-17.)  The spot checkers "were supposed to observe everything" at the jobsites.  (ECF No. 64, Joint Stips. ¶ 94 (internal quotation marks omitted).)  They made sure that the spotholders used the right number of cones, placed the cones correctly, and kept cars from parking in the designated spots.  (*Id.* ¶ 95.)  Spotholder Kamal

Olalekan testified that a spot checker sent him home "several" times, when a member of the public insisted on parking in a spot that the spotholder was trying to hold.  (Tr. 251:22–252:14.) The spot checkers also confirmed that the spotholders were following the defendants' work rules. (ECF No. 64, Joint Stips. ¶¶ 94, 96; Tr. 17:21–18:10, 82:23–83:4, 221:15–222:21, 248:10–249:1, 278:22–280:15, 419:22–420:23, 446:13–447:17.)

### iii.    Concord's Rule Enforcement and Discipline

The defendants, through the dispatch office and the supervisors, regularly disciplined spotholders for violating the rules.  For example, they sent them home before the job was done, "suspended" them, threatened termination, or withheld job assignments for as long as a month. (Tr. 127:2-13, 128:17–129:2, 236:14–19 (former dispatch office employee Galloway testified that "[t]he longest I've seen a driver [suspended] [was] over a month."), 249:14–251:8, 450:7–24 (spotholder Anthony Smith did not "get a job for like a week or [ ] two or something like that" after a supervisor discovered he was not at the jobsite "so they called the [dispatch] office"), 472:18–20 (Q: "Did they say what would happen if you left the site?"  A: "Consequences, like, they can fire you and lay you off.").  While supervisors were sometimes lenient, they could also be arbitrary and severe, "depend[ing] on how [the dispatcher] feels."  (Tr. 222:8-21; *see* Tr. 127:19–128:3 (Q: "Did you have an understanding of what the consequences were . . . for breaking any rules at Concord?"  A: "No, not exactly, you know, because it was under their discretion.").)

According to Galloway, the defendants used a "discipline board" — a whiteboard on the wall in the dispatch office where all the dispatchers worked in the same room — to keep track of disciplined and suspended spotholders, and which spotholders to call for assignments.  (Tr. 222:22–223:19.)  Zack Muradian, who ran the dispatch office, instructed dispatchers to write the

car numbers of the spotholders "that he [didn't] want . . . working" on the discipline board; if a spotholder's car number was on the board, the dispatchers "couldn't give him a job." (Tr. 223:2-19.)  Muradian "yell[ed]" at spotholders over the phone; he told them "don't call . . . [y]ou're not getting a job," and that the dispatch office "[wi]ll call you when we need you." (Tr. 223:20-224:13.)  Suspensions — and the length of the suspensions — were arbitrary.  Galloway testified that the decision to suspend a spotholder "depend[ed] on how Zack feels . . . [h]e'll send you home, he'll take you off for a couple of days.  It really depends on how he feels." (Tr. 222:12-21.)  Muradian kept suspended spotholders on the discipline board until he "fe[lt] like he want[ed] to take [the spotholder] off" the board. (Tr. 224:14-16.)  Suspensions could last days, weeks, or months. (Tr. 224:14-25, 233:7-21.)

Muradian claimed that the board was not a "discipline board," but an "information board" where dispatchers posted information about individual spotholders' cars. (Tr. 610:20–613:2.)  The board was a way for all the dispatchers to "input" information about the spotholders to the team so they could "service [ ] Con Edison the best way possible." (Tr. 612:17-24.)  He conceded, however, that he put spotholders on the board so that other dispatchers would "be aware that this individual sometimes might be a problem on a site," and that he "would lean towards the person that's always on location over not on location," so "you would be kind of choosing the better out of the worse." (Tr. 611:21–612:12.)  Muradian "assume[d]" that other dispatchers understood that was why the "problem" spotholders' car numbers were on the board, and testified that "it was a discussion between" all the dispatchers. (Tr. 612:13–613:2.)

Although Muradian may have minimized what went on in the dispatch office, the Court finds that his testimony was generally credible.  Muradian and Galloway, whom the Court also

18

credits, agreed that the board was used to decide which spotholders would get jobs, and that drivers who were on the board did not get jobs. (Tr. 223:2-19, 232:8-13, 611:21–613:2.)

The spotholders expected the defendants to discipline them for breaking the defendants' rules. They understood that the defendants' rules applied to them, and they expected the defendants to enforce them. (*See, e.g.*, Tr. 17:21–18:3 ("You understood that [sleeping] was prohibited because at some point you were told and at some point the supervisor would come and check to see that you were not sleeping"), 18:23–19:1, 82:24–83:3, 83:16-22, 128:4-10, 221:15–222:21, 251:11–253:1, 278:22–279:12, 279:20-23, 446:13–447:5, 472:7-20.) Of the nine spotholders who testified, seven were disciplined for violating the defendants' rules. The defendants gave Dennis Danville a warning after a supervisor thought he had fallen asleep (Tr. 18:4-19), and gave Catrice Brown a warning for being away from her car without informing the dispatch office (Tr. 100:10–101:7). The defendants suspended Olubukola Ogunsemowo for a week when she left the site to use a nearby bathroom. (Tr. 477:9-16.) The defendants sent Gerald Celestine home early because he could not find a jobsite, even though the dispatchers had sent him the wrong picture of the structure (Tr. 127:2-13, 140:6–142:12), and sent Kamal Olalekan home early for sleeping on two occasions, though he was not sleeping the second time (Tr. 249:14–251:8). The defendants also suspended Gerald Celestine — who lived in his car with his dog and accepted nearly every job assignment the defendants offered him — for at least a month for perceived insubordination. (Tr. 122:20–123:4, 132:18–133:3, 144:8–145:5.) A supervisor discovered that Anthony Smith left a jobsite, so the defendants sent him home that day and withheld assignments from him for at least a week. (Tr. 450:7-24.) The defendants threatened Ansel Campbell with termination when he tried to correct a paperwork error — Con Edison had put the wrong date on his timesheet when signing him out — that could have resulted

19

in his not being paid for two weeks of work, then downgraded the discipline to a two-week suspension. (Tr. 314:25–317:2.) Some of the spotholders knew of others who were sent home for infractions, and generally understood that suspension and termination were both potential consequences for noncompliance with the defendants' rules. (*See, e.g.*, Tr. 128:4-16, 285:20-22, 436:10-17, 477:5-16; Sec. Ex. 25 ¶ 12; Waheed Dep. 181:9-19.)

Additionally, the spotholders consistently testified the defendants withheld assignments if they declined jobs even though the form contracts permitted them to reject jobs. (Tr. 31:25–32:5, 58:14–59:9, 228:22–229:12, 281:13-23 (spotholder Folusho Babatunde testified that there was "a penalty for you to get any job" if you reject an assignment, and that Muradian told him there would be a "[t]wo-week suspension"), 417:18-22 (Q: "[C]ould you reject an assignment?" A: "Not without consequences."); Sec. Ex. 24 ¶ 3, Sec. Ex. 25 ¶ 14.)

f.    **Schedule**

The spotholders worked long shifts that could stretch into days or weeks, depending on the assignment and whether the dispatch office sent a relief spotholder to take over. They often did not know before they accepted an assignment how long it would last. The assignments often did not include an end date or time. (Tr. 104:10–105:22 (spotholder describing that an assignment would only "[s]ometimes . . . have an end time").)

The standard shift was supposed to be twelve hours. (Tr. 21:5-11.)[11] Sometimes, Con Edison would close out a job or release a spotter before twelve hours. (Tr. 21:12–22:23.) Other times it took days for Con Edison to finish a job. (*See, e.g.*, Sec. Ex. 30 at 119 (DEF0007877) (Concord dispatcher informing Con Edison that "we have been trying to locate the [p]erson

---

[11] During most of the relevant time period of January 5, 2018 through March 28, 2020, the standard shift was twelve hours, but the defendants decreased it to eight hours towards the end of the relevant time period. *See* Sec. Ex. 30 at 400–01 (DEF0047312–13) (reflecting eight-hour shifts).

who[se] car is next to structure but no luck so far we will continue to search"), 327 (DEF0037936) (Concord dispatcher reminding Con Edison that two spotholders have been on one location for sixteen days), 348 (DEF0042595) (Concord dispatcher reminding Con Edison that seven spotholders have been on one location for ten days).)  At times, Con Edison wanted spotholders to remain onsite after they had secured spots and Con Edison started work.  (Tr. 240:9-19, 310:25–311:15; *see* Ex. 30, at 267 (DEF0034639) (Con Edison asking Concord dispatcher to keep spotholder "on location" until Con Edison completed transformer replacement).)

Sometimes a shift lasted longer than twelve hours because the defendants did not send a replacement spotholder.  (Tr. 288:23–289:11 (spotholder testifying that she learned a job was going to be twenty-four hours because "[a]t the end of the [twelve-hour] shift . . . [y]ou call the [dispatch office] and they tell you they can't find relief," and that "[i]n most cases you can't say no" to staying for another shift without notice "because the management"), 422:4-10 (spotholder testifying "I would gladly stay" if the defendants did not send a relief spotholder because "you were there and you would get paid for it"), 451:19–452:6 (spotholder testifying "if you don't get a relief then I'm stuck, I have to stay there" or else he "would get in trouble").)

Spotholders regularly worked overtime hours each week (*see generally* Sec. Ex. 27),[12] and their work for the defendants was their primary, or sole, source of income (*see, e.g.*, Tr. 37:4-7, 291:15-17, 322:1-3, 426:12-18, 454:22-24, 487:11-13).  Of the nine spotholders who

---

[12] The defendants attached visual aids to their post-trial brief illustrating in bar charts the "Hour Variation" in the spotholders' monthly hours.  (ECF No. 82-1.)  According to the defendants, these charts show that the schedules were like a contractor's schedule.  (*See* ECF Nos. 82 at 28.)  But the charts are based on the data in the Secretary's calculation — which only captured workweeks where the spotholders logged over forty hours in their timesheets.  (*See* Sec. Ex. 27.)  The charts do not show all the hours the spotholders worked.  The charts demonstrate that spotholders regularly worked overtime.  (*See, e.g.*, ECF No. 82-1 at 14 (showing the spotholder worked overtime hours at least one week per month during all but three months from January 2018 to December 2020).)

testified, only two had any other work: Dennis Danville, who generally worked full-time for the defendants and had an unrelated part-time, home-based retail business (Tr. 12:20–13:4, 32:14–33:7, 45:5–46:1), and Catrice Brown, who took on additional spotholding work for another company in 2022, after the relevant time period, when Concord no longer offered enough hours (Tr. 74:14-15, 89:2-6, 94:25–95:4). Under the form contract, the spotholders could work for another company only if it did not "interfere" with their work for the defendants. (Sec. Ex. 24 ¶ 5.) One spotholder testified that "there's no way" to work for a second company "because of the time we work." (Tr. 487:1-7.)

As explained above, the defendants did not allow the spotholders to leave the jobsite even briefly, for example, to use the bathroom, unless the dispatch office gave them permission. (ECF No. 64, Joint Stips. ¶ 99; Sec. Ex. 25 ¶ 3 (form contract requiring spotholders to "call the [dispatch office] and obtain prior permission confirmed by text or e-mail" in order to "leave the location for any emergency such as bathroom break"); Tr. 19:5-18, 129:5–130:5, 217:22–218:12, 280:1-15, 344:23-25, 415:18–416:1, 447:4-17, 475:11–476:14.) Even then, the dispatch office sent relief late or not at all. (Tr. 19:5-18, 83:5-12, 129:5–130:14, 280:1-15; 447:4-17, 475:11–476:14.) Takeia Galloway testified that the spotholders called her "all the time" for permission to use the bathroom; she "tr[ied] to cover for them" "[b]ecause nine times out of ten, they don't want to wait till the supervisor gets there [because] they take too long," "[s]o they would want to really go ahead and go to the bathroom and they don't want to tell that to Zack [Muradian] because that would be a problem." (Tr. 217:22–219:9; *see also* Tr. 476:3-10 (spotholder Anthony Smith testifying that Muradian "wouldn't allow you to leave the site" to use the bathroom).) If the dispatch office did not give the spotholder permission to leave the jobsite, the spotholder had limited choices: wait for the dispatcher to send relief, which could take hours;

22

risk disciplinary action by leaving the post to use restroom, if one was nearby; or using bottles, bags, or camping toilets.  (Tr. 19:5-18, 23:10–24:20, 83:5–84:11, 129:5–130:5, 217:22–219:9, 280:1-15, 415:18–416:1, 475:14–476:14.)

### III.    Investigation and Reclassification of Spotholders

#### a.    The U.S. Wage and Hour Division's Investigation and Backpay Calculation

In 2019, the U.S. Wage and Hour Division ("WHD") opened an investigation into the defendants, led by Assistant District Director ("ADD") Joe Xiong.  (Tr. 526:4-13.)  As part of the investigation, ADD Xiong reviewed the defendants' business records, including pay records and time records for spotholders, and interviewed some of the workers.  (ECF No. 64, Joint Stips. ¶ 126; Tr. 526:12–527:4.)  The defendants' records generally included the spotholders' names, dates of work and pay dates, and the number of hours for which the defendants paid spotholders per day.  (ECF No. 64, Joint Stips. ¶¶ 123–25; Tr. 529:5-17, 531:14–532:5.)  The defendants also produced additional records up through June 2021 of spotholders' hours and pay.  (Tr. 531:1-8; *see* Sec. Exs. 12–15.)

According to the defendants' records, 329 individual spotholders worked more than 40 hours for the defendants during at least one Sunday to Saturday workweek in the relevant time period.  (*See* Sec. Ex. 27; Tr. 528:22–529:4, 532:11–536:9.)[13]  The defendants never paid overtime to spotholders before February 2021, and they continued to deny overtime pay to certain spotholders through June 19, 2021.  (ECF No. 64, Joint Stips. ¶ 117; Sec. Ex. 27.)  Based solely on the defendants' records, specifically the Internal Revenue Service ("IRS") Form 1099, the Secretary calculated that if the spotholders were considered employees under the FLSA, the

---

[13] ADD Xiong only included individual spotholders, not other spotholder businesses, in his analysis. (Tr. 562:4-24; Sec. Exs. 27–28.)

defendants failed to pay $3,079,486.27 in overtime pay and wages to 329 spotholders for the period from January 5, 2018 through June 12, 2021. (Sec. Exs. 27–28; *see generally* Tr. 524:6–565:22.) To calculate the overtime pay, ADD Xiong entered data from the defendants' 1099 forms into an Excel spreadsheet and calculated the overtime rate premium for hours worked above 40 hours in a workweek. (Tr. 532:11–536:9.) ADD Xiong used the hours for each workweek reflected in the defendants' records. (Tr. 580:11-17.) Because the defendants' records do not show hourly rates, ADD Xiong divided the total gross pay per week by the total hours worked per week to calculate each spotholder's effective hourly rate of pay. (Tr. 534:6-8, 572:19–573:4; Sec. Exs. 12, 27.) ADD Xiong accounted for the changes in the New York State minimum wages over the years, and, based on the Department of Labor's standard handbook used the higher of: (1) an employee's actual rate of pay, or (2) any applicable statutory minimum wage to determine the wages and overtime pay that a spotholder should have been paid if classified as an employee under the FLSA. (Tr. 567:25–569:1.) The Court credits ADD Xiong's testimony and analysis because it is reasonable and based solely on the defendants' own records.

    **b.**     **Defendants' Reclassification of Spotholders as Employees**

In about February or March 2021, after the Secretary filed this action, the defendants reclassified the spotholders as employees for the purposes of overtime pay, pending the outcome of this litigation. (ECF No. 64, Joint Stips. ¶ 64.) If they prevail in this litigation, the defendants intend to resume treating spotholders as independent contractors for FLSA purposes. (Tr. 347:2-6; Kaviar Dep. 77:10-14; Waheed Dep. 127:23–128:5.)

**CONCLUSIONS OF LAW**

The question before the Court is whether the spotholders were employees, as the Secretary asserts, or independent contractors, as the defendants say they were. According to the

24

Secretary, the spotholders are employees "as a matter of economic reality" because they earned hourly wages working long shifts in difficult conditions, had to check in regularly with the defendants' dispatch office and supervisors, could not negotiate the terms of their relationship with the defendants, and were regularly subjected to arbitrary extensions of their shifts, as well as discipline for failure to accept assignments or minor rule infractions.  (ECF No. 81 at 8–9 (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988)).)  In short, the plaintiff argues, the spotholders "were not in the spotholding business for themselves," but rather, "provided the day-to-day services necessary for [the defendants] to fulfill their contracts with Con Edison," from which the defendants "derived the vast majority of their millions of dollars of revenue."  (*Id.*)  The defendants, on the other hand, argue that they did not exercise sufficient continuous, regimented control over the spotholders because the spotholders chose whether to take assignments, worked irregular hours, were not formally disciplined by the defendants, and could work for other companies.  (*See* ECF No. 82 at 6–29.)

In a civil action for damages, the plaintiff bears the burden of proving each element of his claims by the "preponderance of evidence."  *See, e.g.*, *Wang v. XBB, Inc.*, No. 18-CV-7341, 2022 WL 912592, at *3 (E.D.N.Y. Mar. 29, 2022) (quoting *Hassoun v. Searls*, 968 F.3d 190, 202 (2d Cir. 2020)).  "To be held liable under the FLSA, a person must be an 'employer.'"  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee," and an "employee" is "any individual employed by an employer."  29 U.S.C. § 203(d), (e)(1).  The "determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'"  *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker*

25

*House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  Courts should not focus on "isolated factors but rather upon the circumstances of the whole activity." *Id.* (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

In this circuit, courts apply the "*Brock* factors" to determine whether an employee-employer relationship exists.  Those factors are "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 67 (2d Cir. 2003) (citing *Brock*, 840 F.2d at 1058–59).  While "[t]he existence and degree of each factor is a question of fact," the "legal conclusion to be drawn from those facts — whether workers are employees or independent contractors — is a question of law." *Brock*, 840 F.2d at 1059.  No factor "'is dispositive,' nor were they, as a whole, 'exclusive,'" and courts must consider "the totality of the circumstances" of the relationship. *Barfield*, 537 F.3d at 142–43 (quoting *Brock*, 840 F.2d at 1059).  The "ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Brock*, 840 F.2d at 1059.

Applying the *Brock* factors to the facts of this case, the Court easily concludes that there was an employer-employee relationship between the defendants and the spotholders.

## IV.   *Brock* Factors

### a.   Degree of Control

First, the evidence established convincingly that the defendants "exercised substantial control over the manner and conditions of [the spotholders'] work," including in hiring, compensation, scheduling, and supervising the spotholders' work. *Id.* at 1061.

26

### i.    Hiring and Terms of Relationship

The evidence at trial established that the defendants controlled the hiring of and contractual relationship with the spotholders.  First, the defendants either advertised for spotholders or contacted spotholding companies that were going out of business.  (ECF No. 64, Joint Stips. ¶ 68; Tr. 276:18–277:19; 305:5-17.)  They did not seek spotholders who advertised, and there is no evidence in the record that any of the spotholders advertised their services.  (ECF No. 64, Joint Stips. ¶ 69.)  Second, the defendants required the spotholder applicants to sign a form contract that the defendants' lawyer drafted.  (ECF No. 64, Joint Stips. ¶¶ 77–80.)  The spotholders had no opportunity to negotiate the contract terms or their working conditions, which were described in the contract.  (ECF No. 64, Joint Stips. ¶¶ 77–80; Tr. 10:19–11:1, 163:11-23, 321:7-15, 342:24–343:4, 400:7-15; Gavrilov Dep. 97:18-20; Waheed Dep. 176:4-13; Kaviar Dep. 51:11-14.)  Third, the spotholders had no control over their pay.  The defendants set the hourly wages without negotiation or the spotholders' input.  (ECF No. 64, Joint Stips. ¶¶ 114–15; Tr. 290:4-20 (there was "no room" to negotiate their hourly rate because the defendants "were the owners," and "[spotholders] can't really ask questions"), 453:15–454:8 (the defendants "never explained" why they lowered spotholders' hourly pay rates, and the spotholders "did complain but if you complained too much you might not get a [spotholding] job")).)  "[U]nilaterally dictat[ing]" a worker's hourly wage is probative of an employer-employee relationship.  *Brock*, 840 F.2d at 1057–58, 1060–61; *see also Xue v. Koenig*, No. 19-CV-7630, 2022 WL 4279185, at *6–7 (S.D.N.Y. Sept. 14, 2022) (finding employee status where the company had "unilateral[]" ability to set hourly wages and change them over time).  The defendants had exclusive control over the terms of the relationship, their job, and their pay, establishing that the spotholders "provid[ed] services as 'the [defendants] desire[d] and

27

receiv[ed] the compensation the [defendants] dictate[d].'" *Vasquez v. NS Luxury Limousine Serv., Ltd.*, No. 18-CV-10219, 2021 WL 1226567, at \*5 (S.D.N.Y. Mar. 31, 2021) (quoting *Goldberg*, 366 U.S. at 32). This is "a telltale sign that a worker is an employee." *Id.*

Accordingly, this factor weighs decisively in the Secretary's favor.

### ii.    Assignments and Schedule

The defendants controlled the spotholders' job assignments and schedules. While in some instances dispatchers considered the spotholders' preferences — for shifts or areas in the city (*see, e.g.*, Tr. 11:24–12:17, 307:4-7) — there were also consequences for spotholders who did not accept assignments. (*See, e.g.*, Tr. 228:19–229:12.) Dispatchers regularly contacted spotholders with urgent, or "ASAP," assignments — assignments that required the spotholders to drive to jobsites across the city. (*See, e.g.*, Tr. 76:23–77:8, 122:10-17; Sec. Ex. 30 at 115–16.)[14]

The spotholders' shifts were long, the conditions harsh, and the rules inflexible. The spotholders had no control over when their shift was over. The defendants or Con Edison sometimes released the spotholders early if Con Edison finished working at a jobsite. (Tr. 21:12–22:23, 69:15-25, 318:21–319:8, 483:23–484:2.) The spotholders did not have control even when their shift was supposed to end after twelve hours. Rather, they had to stay until their relief showed up, even if the next worker was late or never showed up at all. (Tr. 289:2-11, 318:21–319:15, 422:4-10, 451:22–452:6.) Indeed, spotholders learned that they had to stay for another twelve-hour shift "at the end of the [initial twelve-hour] shift," when a supervisor told them "they can't find relief." (Tr. 289:2-6.) "In most cases," the spotholders could not "say no."

---

[14] *See also* Tr. 146:18-23 ("Sometimes they would call me an hour before the job telling me, this is an ASAP. That means get there as soon as you can."), 211:16-23, 473:13-24 ("At times it has to be ASAP . . . [i]t might be 30 minutes before the assignment or one hour before the assignment."); Sec. Ex. 30 at 113 (DEF0007491) ("urgent request" from Con Edison to dispatch a spotter "en route ASAP"), 129 (DEF0009703) (Con Edison requesting a spotholder at 2:12 p.m. for 3:00 p.m. the same day), 346–47 (DEF0042592–93) (Concord dispatching eight spotholders at once on short notice).

(Tr. 289:7-11.) If there was no relief, they were "stuck" and had to stay for the extra shift or "get in trouble." (Tr. 451:19–452:6.) The defendants' ability to compel the spotholders to stay for an extra shift without notice is additional evidence of an employer-employee relationship. *See Arena v. Plandome Taxi, Inc.*, No. 12-CV-1078, 2014 WL 1427907, at *5, 7 (S.D.N.Y. Apr. 14, 2014) (a transportation company "dictat[ing] the hours the drivers worked" supported finding employee status).

It is undisputed that the defendants would not let the spotholders give a job assignment to another spotholder or find their own relief, facts that also show the defendants' control over them. (*See, e.g.*, Sec. Ex. 25 ¶ 11; Tr. 166:17-19 (Gavrilov testifying to the same), 344:23–345:13 (Waheed testifying to the same).) *See Gayle v. Harry's Nurses Registry, Inc.*, No. 07-CV-4672, 2009 WL 605790, at *6 (E.D.N.Y. Mar. 9, 2009), *aff'd*, 594 F. App'x 714, 717 (2d Cir. 2014); *cf. Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 143 (2d Cir. 2017) (noting the drivers' practice of "hiring their own helpers" supported independent contractor finding) (citation modified).

iii.     *Economic Dependence*

The evidence also established the "economic reality" that the spotholders depended on the defendants for work. They were willing to work under difficult and often humiliating conditions because they needed the work. They could not take breaks without permission, which they often did not get from the dispatch office, even to use the bathroom. (*See, e.g.*, Tr. 217:22–219:9.) If they did not have permission to leave the jobsite, or if there was no bathroom nearby, the spotholders had to use bottles, bags, or camping toilets. (Tr. 19:5-18, 23:10–24:20, 83:5–84:11, 98:19–99:23 ("When you get to a[n] area and you see what kind of location it is, you see that there's no bathroom or there's no store, you either hold it or you just do without, because the

29

whole purpose is to get the hours, to get the money."), 280:1-15, 415:18–416:1, 475:14–476:14.) Spotholder Christopher Guevara, who started working for the defendants when he was 18 years old, testified that he "would gladly stay" for another twelve-hour shift if the defendants did not send relief because "you were there and you would get paid for it." (Tr. 412:22-23, 421:6-10, 422:4–10.) Gerald Celestine took the job when he "was going through something," was "staying in [his] van" with his dog, and "wanted to get [his] life back together," so he "really didn't reject no jobs;" Celestine's longest job assignment was for "a month straight, 24 hours," and he "never left the site" during that time. (Tr. 122:20–123:5, 132:2–133:3.) This evidence clearly shows that "as a matter of economic reality, the [spotholders] depend[ed] upon [the defendants] for the opportunity to" work as spotholders. *Brock*, 840 F.2d at 1059 (citations omitted).

While the spotholders could theoretically work for another company, they could do so only if it  would "not interfere" with their work for the defendants. (Sec. Ex. 24 ¶ 5.) As a practical matter, this was impossible. The defendants needed spotholders to be available for last-minute work with unpredictable hours. According to the spotholder Olubukola Ogunsemowo, there was "no way" to work for a second company "because of the time we work." (Tr. 487:1-7.) This aspect of the relationship is yet further proof that the spotholders were the defendants' employees. *C.f. Saleem*, 854 F.3d at 141 (2d Cir. 2017) ("The fact that [p]laintiffs could (and did) work for [the defendant's] business rivals and transport personal clients . . . without consequence suggests . . . that [the defendant] exercised minimal control . . . [because] a company relinquishes control over its workers when it permits them to work for its competitors[,] [and because] when an individual is able to draw income through work for others, [that person] is less economically dependent on his [or her] putative employer."). Because the defendants were "primarily responsible for assigning work," and "dictating compensation, the

'degree of control' is considered to be high." *Vasquez,* 2021 WL 1226567, at \*6 (citations omitted).

### iv.   *Supervision and Discipline*

In *Brock,* supervisors "unequivocally expressed the right to supervise" workers, visited job sites once or twice a month, and required workers, who were nurses, to submit notes regarding their cases.  840 F.2d at 1060.  Observing that "[a]n employer does not need to look over his workers' shoulders every day in order to exercise control," the Second Circuit found that the defendant exercised control over its workers.  *Id.* at 1060 (citing *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1383–84 (3d Cir. 1985)).

Here, the defendants exerted far more control over the spotholders.  As explained above, the spotholders had to contact the dispatch office, including when they arrived at a jobsite, and before they left at the end of a shift.  Supervisors checked on them regularly for updates, to ensure compliance with the rules, and to prepare reports for Con Edison.  (Tr. 16:4–17:18, 81:3–82:16, 124:23–125:17, 214:4–216:21, 283:25–285:17, 449:14–450:6, 479:3-10.)  Spot checkers visited jobsites without notice to monitor job performance and confirm that the spotholders were following the defendants' rules.  (*See, e.g.*, Tr. 16:11-18 (spot checkers came by "at least once per shift"), 285:7-17, 449:23–450:6.)  This extensive supervision is evidence of the defendants' control.  *See Brock*, 840 F.2d at 1060.

The defendants disciplined the spotholders for perceived violations of rules, which is an obvious sign of control, and kept track of the punishments on the "discipline board."  (Tr. 222:22–224:25, 233:7-21.)  As explained above, dispatchers and supervisors punished spotholders if they fell asleep, left the site to use the bathroom, or violated any of the other rules; they sent workers home, withheld assignments, "suspended" them, and threatened termination.

31

(*See, e.g.*, Tr. 127:2-13, 128:17–129:2, 236:14–19 ("[t]he longest I've seen a driver [suspended] [was] over a month."), 472:18-20 (Q: "Did they say what would happen if you left the site?" A: "Consequences, like, they can fire you and lay you off.").)

The defendants argue that discipline was not a sign of control because it was "ad hoc" and depended "on the mood or discretion of the dispatcher." (ECF No. 82 at 13.) They also suggest that the discipline was not especially severe, because the "the most common" consequence was "that a dispatcher might offer fewer calls temporarily." (*Id.*) Even if this is correct, the fact that the defendants punished a group of workers who were economically dependent on them — so much so that they were willing to work consecutive 12-hour shifts under harsh conditions — is evidence of control. *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 917–18 (S.D.N.Y. 2013) ("The mere threat of imposition of such [discipline] operated as a sword of Damocles over the [workers], helping ensure [worker] compliance with the [defendants' rules].").

Accordingly, the Court finds that the evidence demonstrates that the defendants "exercise[d] substantial control" over the spotholders' work, *Brock*, 440 F.2d at 1060–61, and this factor weighs in favor of finding the spotholders were employees.

### b.      Opportunity for Profit or Loss

The second *Brock* factor — the workers' opportunity for profit and loss or to invest in the business — also favors the spotholders. The spotholders had no opportunity for profit or loss. They earned an hourly wage, at rates the defendants set and sometimes lowered. (ECF No. 64, Joint Stips. ¶¶ 113–15; Tr. 9:24-25, 36:17-25, 120:14-19, 247:8-9, 290:11-12, 320:22-24, 425:13-18, 453:15-16, 486:5-9.) They never earned bonuses or raises. (*Id.*, Joint Stips. ¶¶ 119–20.) The only way to earn more money was to work more hours. (Tr. 37:1-3, 65:17-20, 88:10-

12, 112:2-4, 155:23–156:1.)  When workers "earn only an hourly wage for their labor and have no downside exposure," this second factor "weighs heavily in favor of the [workers'] status as employees."  *Gayle v. Harry's Nurses Registry, Inc.*, 594 F. App'x 714, 716–17 (2d Cir. 2014) (summary order) (upholding finding that nurses were employees based on "economic realities" of the relationship with the defendants); *cf. Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 11–12 (E.D.N.Y. 2014) (independent contractor driver controlled "how much overall money he earned as a result of the number of calls he took and fares he earned") (citations omitted).

Nor did the spotholders make "'large capital expenditures'" as part of their work, which is "highly relevant" in determining whether an individual is an employee or an independent contractor.  *Saleem*, 854 F.3d at 1440 (2d Cir. 2017) (quoting *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989)) (citations omitted).  While the spotholders bought the equipment that the defendants required, sometimes from the defendants, their outlay for that equipment — hard hats, safety gloves, safety vests, flashlights, and safety cones (ECF No. 64, Joint Stips. ¶ 74) — was well within the range that courts have found to be "negligible," weighing strongly in favor of employee status.  *See Saleem*, 854 F.3d at 144 ("annual investment of $400" (in 1989 dollars) "in tools or equipment [was] negligible" (quoting *Dole*, 875 F.2d at 810–11)).  The spotholders were not trying "to generate a return on . . . investment" when they bought equipment like hardhats, boots, and cones.  *Id.* (quoting *Dole*, 875 F.2d at 811) (citations omitted).  They were just doing what the defendants directed them to do.  Nor does the fact that they used their own cars and had to maintain insurance mean that they were independent contractors.  *See Campos v. Zopounidis*, No. 09-CV-1138, 2011 WL 2971298, at *6–7 (D. Conn. July 20, 2011) (finding on summary judgment that the plaintiff-driver was an employee even though he used his own vehicle, because plaintiff's investment was still less than defendant's).

33

Accordingly, this factor weighs in favor of finding that the spotholders were employees.

**c.      Degree of Skill**

The third *Brock* factor — the degree of skill and independent initiative — also favors the spotholders.  If workers do not need to have special skills, or if no "independent initiative" is required to perform the work, they are more likely employees.  *Vasquez*, 2021 WL 12264567, at *7.  As described above, spotholding did not require specialized skill.  Spotholders had to drive to a location, save parking spots for Con Edison workers, and monitor the location.  (Tr. 8:15-19, 124:19-22, 213:14-20, 282:8-14, 310:25–311:5, 343:5-9, 412:16-21, 444:14-16, 477:23–478:8; Gavrilov Dep. 69:14–70:6.)  If other drivers got angry about losing a spot, the spotholder was not supposed to argue with them.  (Tr. 62:25–64:15, 298:24–299:22.)  As Gavrilov put it, the "job is very, very simple," all spotholders have to do is sit in the car and make sure spots stay open. (Gavrilov Dep. 108:22–25, 145:21-22.)  Indeed, because the spotholders did not need to have special skills, the defendants did not look for workers with experience or special training.  (ECF No. 64, Joint Stips. ¶¶ 69–73.)  *See Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 541 (S.D.N.Y. 2014), *order clarified*, No. 12-CV-8450, 2014 WL 7106442 (S.D.N.Y. Dec. 9, 2014), *and aff'd sub nom. Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131 (2d Cir. 2017); *see also Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 326 (S.D.N.Y 2001); *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 351 (E.D.N.Y. 2015) ("[D]riving is not" a "specialized skill.").

Accordingly, this factor also weighs in favor of finding that the spotholders were employees.

### d.   Permanence or Duration of the Working Relationship

The next factor is the permanence or duration of the relationship.  This factor, too, weighs in favor of finding an employer/employee relationship.  A worker who is "transient" and "typically works for several employers" is generally more likely to be an independent contractor.  *Brock*, 840 F.2d at 1060–61; *see also Saleem*, 52 F. Supp. 3d at 543 (S.D.N.Y. 2014) ("Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." (quoting *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998))).

The defendants' contracts provided for open-ended periods with no end dates or timeframes for completion.  (ECF No. 64, Joint Stips. ¶ 81.)  For almost all of the spotholders, this was their only job,[15] and many of them worked for the defendants for years.  (*See, e.g.*, Tr. 8:11-14 (spotholder worked for the defendants for approximately eight years), 74:11-15 (spotholder worked for the defendants for approximately five years), 118:12-15 (spotholder worked for the defendants for approximately six years).)  The defendants did not tell the spotholders that the job was temporary, and the spotholders "had the understanding that it would be an open-ended job."  (Tr. 10:3-18; *see also* Tr. 75:12-16, 120:7-13, 277:24–278:1, 306:10-12, 413:24–414:1, 445:21-23, 471:13-20.)  They also regularly worked overtime.  (*See* Sec. Ex. 27.)  The spotholders' working relationship with the defendants was "continuous" and "of indefinite

---

[15] Indeed, only one testifying spotholder had anything close to a second job during the relevant time period.  Dennis Danville, who typically worked the overnight twelve-hour shifts Monday through Thursday, had an unrelated part-time, home-based retail business selling herbal products.  (Tr. 12:7–13:4, 32:14–33:7, 45:5–46:1.)

35

duration," which favors employee status.  *Saleem*, 52 F. Supp. 3d at 543 (S.D.N.Y. 2014) (citation omitted).

Also significant, as explained above, is the fact that the spotholders really could not work for anyone else.  *See* Section IV.a.iii.  In short, the spotholders generally "work[ed] for only one employer," and the relationship was "continuous and of indefinite duration."  *Saleem*, 52 F. Supp. 3d at 543 (S.D.N.Y. 2014) (citation omitted).  This factor favors employee status.

**e.      Extent to Which Work Is Integral Part of Employer's Business**

The last factor is whether spotholding was an integral part of the defendants' business.  It was.  The defendants stipulated that they could not run their spotholding business or fulfill their contractual obligations to Con Edison without the spotholders.  (ECF No. 64, Joint Stips. ¶¶ 103–04.)  Moreover, the spotholding business was the largest source of the defendants' annual income for the relevant time period (Gavrilov Dep. 47:9-11, 53:5-14), and Defendant CES existed as an entity for the sole purpose "to pay spotholders and to do the financial accounting for the spotholders" (ECF No. 64, Joint Stips. ¶ 32).  *See Brock*, 840 F.2d at 1059–60 (holding that "nurses constituted the most integral part of [the defendant's] business, which is to provide health care personnel on request" and that this "weigh[s] heavily in favor" of determining that the nurses were employees).

\* \* \*

Accordingly the Court finds that "as a matter of economic reality," the spotholders were not "in business for themselves," but rather depended on the defendants' business to render spotholding services, and thus were the defendants' employees under the FLSA.  *Brock*, 840 F.2d at 1059.

36

## V.      Recordkeeping

The Secretary argues that the defendants violated the recordkeeping provisions of the FLSA because they did not keep "records of daily and weekly hours, or hourly pay rates." (ECF No. 81 at 62–63 (citing 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(6)(i), (a)(7)).) The defendants do not address these allegations.

Section 211 of the FLSA requires covered employers to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment," as "prescribe[d] by" Department of Labor "regulation[s]." 29 U.S.C. § 211(c); *see* 29 C.F.R. Part 516. The implementing regulations require a covered employer to keep records that include hours worked each workday, hours worked each workweek, wages due for hours each workweek, total overtime premium pay, total wages paid each pay period, and the dates of the payment and the pay period covered. 29 C.F.R. § 516.2(a). As ADD Xiong testified and the documentary evidence shows, the defendants' records did not include weekly hours or hourly pay rates. (Tr. 529:5-17, 532:3-5, 539:23-25, 552:2-4, 555:1-4, 557:10-14, 572:19-22; Sec. Exs. 12–13.) Accordingly, the Court finds that the defendants' recordkeeping did not comply with Section 211 of the FLSA.

## VI.      Damages

Having determined that the spotholders are properly classified as employees under the FLSA, the Court addresses the question of damages.

### a.      Back Wages

An employer who violates Section 207 of the FLSA "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . ." 29 U.S.C. § 216(b). As described above, the Court credits ADD Xiong's testimony and calculation, which was based on the defendants' own business records, of the

37

unpaid wages owed to the spotholders who worked overtime hours during the relevant time period.  (Sec. Exs. 27–28; *see generally* Tr. 524:6–565:15.)  The defendants do not dispute, or even address, this calculation in their post-trial brief.  (*See* ECF No. 82.)

ADD Xiong used the higher of: (1) an employee's actual rate of pay, or (2) any applicable statutory minimum wage to determine the wages and overtime pay that a spotholder should have been paid if classified as an employee under the FLSA.  (Tr. 567:25–569:1; *see also* Sec. Ex. 27.)  The FLSA provides that the overtime premium is "a rate not less than one and one-half times the regular rate at which [someone] is employed."  29 U.S.C. § 207; *see also* 29 C.F.R. § 778.107 ("If the employee's regular rate of pay is higher than the statutory minimum, his overtime compensation must be computed at a rate not less than one and one-half times such higher rate.").  Furthermore, the FLSA also contains a savings clause that provides "[n]o provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter."  *Bell v. ArchCare Cmty. Servs., Inc.*, No. 24-CV-1877, 2025 WL 1220187, at *6 (E.D.N.Y. Apr. 28, 2025) (alteration in original) (quoting 29 U.S.C. § 218(a)).  If a state minimum wage is higher than the federal minimum wage, "[c]ourts in this circuit agree that, when calculating actual *damages*, plaintiffs will recover under the higher state minimum wage, even for a FLSA claim."  *Id.* (emphasis in original) (collecting cases).

Accordingly, the Court adopts ADD Xiong's calculations and finds that the defendants owe $3,079,486.27 in back wages to the 329 spotholders who worked overtime hours during at least one workweek for the period from January 5, 2018 through June 12, 2021.  (*See* Sec. Exs. 27–28.)

38

**b.      Liquidated Damages**

In addition to unpaid wages, an employer who violates Section 207 of the FLSA "shall be liable to the employee or employees affected . . . an additional equal amount as liquidated damages." 29 U.S.C. 216(b). "Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." *Herman*, 172 F.3d at 142 (citation omitted). "Courts have discretion to deny an award of liquidated damages where the employer shows that, despite the failure to pay appropriate wages, the employer acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or omissions giving rise to the failure did not violate the FLSA." *Id.* (quoting 29 U.S.C. § 260). "The employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *Id.* (citing *Reich v. Southern New England Telecommunications Corp.,* 121 F.3d 58, 71 (2d Cir.1997)). "To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them." *Id.* (citation omitted.)

The defendants argue that they acted in good faith when they classified the spotholders as independent contractors, because they consulted with in-house counsel and their outside accountant. (ECF No. 82 at 29–31.) They argue that "Courts in this Circuit routinely deny liquidated damages where the employer took steps to investigate the legal requirements, sought advice from professionals, or otherwise attempted in good faith to comply with the law." (ECF No. 82 at 31 (citing *Barfield*, 537 F.3d at 150; *Herman*, 172 F.3d at 142).) The Secretary argues that the defendants have not met their "difficult burden," and that one "cursory discussion[]"

39

during which "they never discussed the FLSA at all" does not establish subjective good faith or objectively reasonable grounds for the classification.  (ECF No. 81 at 56–62 (citations omitted).)

At the approximately forty-five-minute meeting in 2016, Gavrilov, Waheed, and Kaviar, the in-house counsel, discussed how to classify the spotholders.  (ECF No. 64, Joint Stips. ¶¶ 57–60; Tr. 170:13–174:14, 195:6-10, 347:18–350:6, 395:9-15.)  Kaviar recommended classifying them as independent contractors, but gave no legal analysis and did not mention the FLSA or its requirements, even though the Con Edison contract explicitly required the defendants "to comply with the Fair Labor Standards Act."  (ECF No. 64, Joint Stips. ¶¶ 57–60; Tr. 172:2-4, 195:6-10, 348:8-10, 348:19–349:4, 395:9-15, 398:22-25; Kaviar Dep. 110:9-17; Sec. Ex. 10 at 20; Sec. Ex. 11 at 21.)  Gorshkov, an accountant, agreed that the spotholders should be classified as independent contractors, but he was relying on the IRS code and his accounting expertise and, not the FLSA, a law with which he was unfamiliar.  (Tr. 174:6-14, 196:6-18, 376:12–377:12, 378:19–379:13.)  Good faith requires the employer to "show at a minimum that it undertook to apply the FLSA's requirements to the particular job at issue."  *Young v. Cooper Cameron Corp.*, No. 04-CV-5968, 2006 WL 1562377, at *9 (S.D.N.Y. June 6, 2006) (citing *Reich*, 121 F.3d at 71).  The only document that Kaviar reviewed before making this recommendation was the Con Edison contract.  (ECF No. 64, Joint Stips. ¶ 58; Tr. 194:19–195:10, 347:25–348:7, 396:10–398:25.)  Kaviar never analyzed the job requirements under the FLSA to determine if spotholders were contractors or employees.  (Tr. 173:21–174:2, 348:14-18, 395:20–396:9; Gavrilov Dep. 139:16-23, 141:6-19; Waheed Dep. 80:13-15, 98:12-14.)[16]

---

[16] In their post-trial brief, the defendants cite the parties' Rule 56.1 statements, which describe, among other things, that "Gavrilov asked whether further research or legal analysis was necessary, and Kaviar responded that he was confident in his conclusion but would 'work on it a little bit deeper.'"  (ECF No. 82 at 30 (citing ECF Nos. 35-1 ¶ 77, 35-2 ¶ 64).)  But this is irrelevant, because the defendants concede that they never discussed the FLSA.

The defendants cite *Barfield* and *Herman* for the proposition that "[c]ourts in this Circuit routinely deny liquidated damages where the employer took steps to investigate the legal requirements, sought advice from professionals, or otherwise attempted in good faith to comply with the law." (ECF No. 82 at 31.)  However, in both cases, the Second Circuit upheld the award of liquidated damages because the defendants did not sufficiently analyze applicable FLSA requirements.  *See Barfield*, 537 F.3d at 150–51 ("[W]e agree with the district court that, as a matter of law, defendants cannot carry the heavy burden necessary to avoid liquidated damages."); *Herman*, 172 F.3d at 142–43 ("Because appellant failed to prove both subjective good faith and objective reasonableness, liquidated damages were properly assessed against him.").  Here, while consulting in-house counsel and an outside accountant was "an active step, its purpose was plainly not to ascertain the dictates of the FLSA with respect to the issue at hand." *Barfield*, 537 F.3d at 151 (quoting *Herman*, 172 F.3d at 142) (citation modified).  The meeting about the classification of the spotholders is therefore "insufficient, as a matter of law, to warrant an exception to the FLSA liquidated damages requirement." *Id.*

Accordingly, the Court awards liquidated damages of $3,079,486.27.  Thus, the combined total of back wages and liquidated damages is $6,158,972.54 to the 329 spotholders who worked overtime hours during at least one workweek for the period from January 5, 2018 through June 12, 2021.  (*See* Sec. Ex. 28 (showing the total back wages, liquidated damages, and overall amounts due to each spotholder).)

## VII.   Injunctive Relief

The Secretary argues that injunctive relief is appropriate because the defendants misclassified the spotholders as independent contractors for years, including "more than a year into the Department's investigation," and have made clear that they will resume treating spotholders as contractors unless the outcome of this litigation prevents them from doing so.

41

(ECF No. 81 at 63–64 (citing Tr. 347:2-6; Kaviar Dep. 77:10-14; Waheed Dep. 127:23–128:5)).) The defendants do not address the request for injunctive relief.

Under Section 217 of the FLSA, district courts may, "for cause shown," "restrain violations of Section 215," including "any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees" under the FLSA.  29 U.S.C. § 217.  "Prospective injunctions are essential because the cost of noncompliance is placed on the employer, which lessens the responsibility of the [Department of Labor] in investigating instances of noncompliance." *Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 404 (E.D.N.Y. 2013) (quoting *Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir.1992) (internal citation omitted)).  Courts consider the "previous conduct of the employer and the dependability of his promises for future compliance" in determining whether a prospective injunction should be granted.  *Solis*, 938 F. Supp. 2d at 404–05 (quoting *Dunlop v. Davis*, 524 F.2d 1278, 1281 (5th Cir. 1975)) (citation omitted); *see also Brock v. Wackenhut Corp.*, 662 F. Supp. 1482, 1488 (S.D.N.Y. 1987) (citing the *Dunlop* standard).

"The resolution of the issue is close." *Brock v. Wackenhut Corp.*, 662 F. Supp. 1482, 1489 (S.D.N.Y. 1987).  As for the defendants' previous conduct, they decided after a brief meeting to classify spotholders as contractors, and showed no interest in complying with, or even understanding, the FLSA.  This resulted in spotholders collectively losing millions of dollars in unpaid overtime wages over the years.  On the other hand, there is no evidence of deliberate bad faith of the sort that courts in this circuit have found justifies injunctive relief.  There is no evidence that the defendants deliberately falsified records or engaged in retaliatory conduct against employees for participating in this lawsuit.  *See, e.g.*, *Solis*, 938 F. Supp. 2d at 404–05. However, as far as the "dependability of [the defendants'] promises for future compliance," the

record does not reflect that the defendants have taken any steps — such as updating or altering their recordkeeping practices — to ensure compliance with wage and overtime requirements, nor have they promised future compliance.  *Cf. Brock v. Wackenhut Corp.*, 662 F. Supp. 1482, 1489 (S.D.N.Y. 1987) (finding that the defendant's "install[ation] [of] a sophisticated computer system designed to assure that each employee's hours of work . . . are accurately recorded so that his or her hourly rate and overtime hours are properly computed . . . will eliminate the problems involved in this action, which were in large measure due to inadequate staff" and declining to impose injunctive relief).  On balance, and because ultimately "[t]he imposition of an injunction is not punitive, nor does it impose a hardship on the employer since it requires him to do what the [FLSA] requires anyway," *Solis*, 938 F. at 404 (citation omitted), injunctive relief is appropriate, in view of the prior misclassification of the spotholders, the declared intent to return to prior practices unless prevented from doing so, and the absence of any effort to understand the FLSA.

**CONCLUSION**

As explained above, the Court finds as a matter of law that the spotholders were employees under the FLSA and are entitled to back wages and liquidated damages of $6,158,972.54.  The Court also grants an injunction pursuant to Section 217 of the FLSA permanently restraining the defendants, their officers, agents, employees, and those persons in active concert or participation with the defendants, from violating the provisions of Sections 207, 211(c), 215(a)(2), and 215(a)(5) of the FLSA, and orders the defendants to reimburse the Secretary for the costs of this action.  The Clerk of Court is respectfully directed to enter judgment and close the case.

**SO ORDERED.**

s/Ann M. Donnelly

_____
ANN M. DONNELLY
United States District Judge

Dated:  Brooklyn, New York
       March 6, 2026